630 So.2d 1271 (1994)
Monroe RICK, Sr., et al.
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
Nos. 93-C-1776, 93-C-1784.
Supreme Court of Louisiana.
January 14, 1994.
Dissenting Opinion January 21, 1994.
Rehearing Denied February 10, 1994.
*1273 Richard P. Ieyoub, Atty. Gen., Duncan S. Kemp, III, Dist. Atty., for State, Dept. of Transp. and Development.
Paul H. Due, Baton Rouge, Joseph H. Simpson, Amite, Grace B. Gasaway, Hammond, Donald W. Price, Due, Smith, Caballero, Price & Guidry, Baton Rouge, for Monroe Rick, Sr., et al.
Dissenting Opinion by Justice Calogero January 21, 1994.
WATSON, Justice.[1]
This is a damage suit for Mary Rick's wrongful death brought by her husband, Monroe S. Rick, Sr., and four of their children, Monroe S. Rick, Jr., Michael E. Rick, Martha Rick Anthony and Melinda Rick Howes. The only defendant is the State of Louisiana through the Department of Transportation and Development (DOTD).

FACTS
On July 20, 1988, Mary Rick was driving a Volkswagen Rabbit west on Minnesota Park Road in Tangipahoa Parish, Louisiana. She stopped at a stop sign and crossed a northbound set of railroad tracks, but her vehicle stopped on the southbound tracks.
Deputy Joseph Tantillo, Jr. of the Tangipahoa Sheriff's Office, who investigated the accident, described the crossing as rough. There was a steep incline up to the timbered tracks. A fast vehicle would bounce on the timbers, catching the undercarriage. The timbers had the effect of potholes, and it was necessary to slow down at the crossing.
The elevated crossing had at least one deep hole confronting westbound motorists. Mrs. Rick would have encountered a hole several feet wide and three or four inches deep. According to Dr. Ehrlich's expert opinion, the hole would have grabbed her left wheel because a Volkswagen's suspension is not much more than three inches high.
Mrs. Rick was proceeding at a slow speed, and her slow progress, the hole or the rough surface apparently caused her vehicle to stall. When the Volkswagen engine killed, it was necessary to turn the key off and then back on again for the engine to restart. The driver of an oncoming car saw Mrs. Rick looking down and to the right before a southbound Amtrak train hit the vehicle, killing Mrs. Rick.
State highway railroad crossings are regarded as on system, and other railroad crossings are off system. The Highway Safety Act of 1973, the federal law making railroad crossing funds available to the states, imposed an affirmative duty to survey *1274 those crossings. 23 U.S.C. § 130(d). See CSX Transportation, Inc. v. Easterwood, ___ U.S. ___, ___, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993).
In 1976, the United States Congress began funding off system crossings, paying ninety percent of the costs. In 1983, after enactment of the Federal Surface Transportation Assistance Act of 1982, the Louisiana DOTD started upgrading off system crossings. Initially, the DOTD's program was limited to urban off system crossings. By 1984, the DOTD was also improving rural off system crossings.
In 1982, the average daily traffic count at the Minnesota Park crossing was 3,186 vehicles. On August 23, 1983, Mayor Debbie Saik Polk of Hammond wrote a letter to the DOTD requesting active warning devices for three dangerous crossings, including the Minnesota Park crossing. In 1984, the DOTD's records showed average daily traffic counts of 3,992 and 4,840 vehicles. Approximately 18 trains a day traversed the crossing. The rough surface and dual tracks added to the risk. There had been several previous accidents.
The DOTD rates crossings under the New Hampshire Formula. The DOTD rated this crossing on the basis of a 1974 inventory which showed the average daily traffic count to be 300 vehicles a day. This resulted in an erroneous hazard index for the Minnesota Park crossing. If a reasonably correct hazard index had been used, the crossing would have had a greater priority.
Despite its low hazard index, the DOTD selected the Minnesota Park crossing for upgrade on September 10, 1986. Active warning devices, automatic signal lights and automatic gates, plus rubber mats to smooth the rough surface were scheduled. The DOTD and the railroad made an on-site inspection of the crossing on April 7, 1987, but the railroad did not approve the upgrade until September 16, 1988. The time period is generally from two to six months. The DOTD does not monitor, calendar or otherwise check on a railroad's response.
The trial court apportioned fault evenly between Mrs. Rick and the DOTD. In fixing damages, the trial court stated:
Monroe S. Rick, Sr., has sustained and will continue to sustain in the future severe and profound loss of his wife's love and affection, society and companionship, as well as past and future grief, mental anguish and distress. The Court accordingly finds that plaintiff, Monroe S. Rick, Sr., has sustained general damages resulting from the wrongful death of his late wife in the sum of $400,000.
After a fifty percent reduction for comparative fault, the trial court awarded damages of $225,614.81 to Monroe S. Rick, Sr. and $75,000 to each of the four children. The court of appeal affirmed the trial court judgment as to the DOTD's fifty percent fault. The court of appeal amended the trial court judgment to reduce Mr. Rick's general damage award to $300,000. After a fifty percent reduction for Mary Rick's comparative fault, the award was $150,000 in general damages and $23,120.25 in loss of earnings for a total of $173,120.25. Rick v. State, through DOTD, 619 So.2d 1149 (La.App. 1st Cir. 1993). Writs were granted to review the judgment of the court of appeal. 625 So.2d 1049 (La.1993).

LIABILITY
The DOTD's writ application was granted to consider the liability issue. The DOTD argues: (1) It had no duty to upgrade this highway/railroad crossing because it was an off system crossing. (2) Any failure to upgrade the crossing was not a cause in fact of the death. (3) Even if the DOTD breached its duty to upgrade the crossing, which was a legal cause, the DOTD is shielded by the discretionary function exception in LSA-R.S. 9:2798.1. (4) The trial court's decision was based on an evidentiary error in admitting into evidence reports, surveys, lists and data proscribed by 23 U.S.C. 409. (5) Evidence of the railroad's release should have been allowed into evidence. (6) There was error in not finding fault on the part of the released tort-feasor railroad.

*1275 DUTY

High train and vehicle traffic volume made this an unusually dangerous crossing. The uneven surface and dual tracks created additional hazards. The DOTD argues that it had no duty to upgrade the crossing.
The DOTD relies on several court of appeal cases which held that the DOTD had no affirmative duty to provide protective devices for railroad tracks crossing off system roads: Webb v. Southern Pacific R. Co., 617 So.2d 618 (La.App. 3rd Cir.1993), writ denied, 625 So.2d 180 (La.1993); Succession of Theriot v. Southern Pacific, 560 So.2d 861 (La.App. 3rd Cir.1990), writ denied, 565 So.2d 451, 453, 454 (La.1990); and Laque v. St. Charles Parish, 444 So.2d 742 (La.App. 5th Cir.1984).
The 1982 Webb accident occurred at a crossing with an automated cross buck, flashing lights and a ringing bell. There had been only one previous accident. The street was located within the City of Crowley, and "the City of Crowley never requested nor did DOTD voluntarily take responsibility for the railroad crossing...." 617 So.2d at 620. Laque involved a 1981 accident on a parish road. As in Webb, the accident occurred before the DOTD started upgrading off system crossings in 1983. Succession of Theriot involved a railroad crossing, but the DOTD had never undertaken any responsibility for marking the crossing.
Here, it is unnecessary to decide whether the DOTD had an affirmative duty because the DOTD assumed a duty to upgrade this crossing by selecting it for improvement on September 10, 1986. Once a duty is assumed, negligent breach of that duty may create liability. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La. 1984).

CAUSATION
The DOTD contends that its failure to upgrade the crossing was not a cause in fact of Mrs. Rick's death. Causation is a fact specific inquiry. The issue is whether defendant's conduct was, in fact, a cause of plaintiff's harm. Great deference is accorded the trier of fact on the question of factual causation. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990); Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990); Rosell v. ESCO, 549 So.2d 840 (La.1989); Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). When multiple causes are present, defendant's conduct is a cause in fact when it is a factor generating plaintiff's harm. Forest v. State, Thru Louisiana D. of Transp., 493 So.2d 563 (La.1986): Vicknair v. Hibernia Bldg. Corp., 479 So.2d 904 (La. 1985); Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). Direct or circumstantial evidence constitutes a preponderance when it shows causation is more probable than not. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993); Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971).
According to witnesses, Mrs. Rick was driving in a cautious and careful manner. She stopped at the stop sign. Presumably, she would have acted with greater caution if there had been flashing lights and a gate. If a gate had been present and lowered, there is a presumption that she would have acted with due regard for her own safety and remained stopped behind the gate.
After slowly crossing the first set of railroad tracks, Mrs. Rick was in a position of peril as she approached the second set of tracks. She was concentrating on the rough surface of the crossing and either did not see or could not avoid the approaching train. Because of her slow progress and the hole in the crossing, it is more probable than not that her small vehicle stalled on the second set of tracks. It is impossible to say that the trier of fact was clearly wrong in finding that the condition of the crossing and the absence of active signals were causes in fact of her death.

DISCRETIONARY FUNCTION EXCEPTION
LSA-R.S. 9:2798.1 provides:
§ 2798.1. Policy-making or discretionary acts or omissions of public entities or their officers or employees
A. As used in this Section, "public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, *1276 officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policy-making or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policy-making or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
D. The legislature finds and states that the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana.
This Court considered the discretionary function exception to state liability in Fowler v. Roberts, 556 So.2d 1 (La.1989). Judicial interference in executive actions involving public policy is restrained by the exception. The Louisiana statute immunizes public entities like the DOTD from liability for policy-based decisions.
A two-step analysis determines whether the exception applies. Berkovitz by Berkovitz v. U.S., 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). First, a court must determine whether the action is a matter of choice. If no options are involved, the exception does not apply. If the action involves selection among alternatives, the court must determine whether the choice was policy based. Decisions at an operational level can be discretionary if based on policy. U.S. v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).
The DOTD argues that whether a particular crossing is selected for upgrade is a matter of discretion protected by the exception. Selecting one crossing for upgrade in preference to another equally deserving crossing would probably be a policy decision. However, this crossing was not selected for earlier upgrade because the DOTD negligently assigned it a low hazard index. If the DOTD had examined its own data, it would have assigned a much higher hazard index to this crossing. Using 1974 data to formulate a 1986 hazard index was not a policy decision. It was operational negligence on the part of the DOTD. This operational negligence and the resulting low hazard index postponed the improvement of this crossing.
After the crossing was selected for upgrade in 1986, there was further delay which the DOTD attributes to the railroad's failure to respond. The erroneous hazard index submitted to the railroad may have contributed to the delayed reaction of the railroad. The DOTD admitted that it made no effort to obtain a timely response and did not calendar or monitor the railroad's reaction. The DOTD does not ascertain that a railroad has even received a priority notice. The railroad prepares the upgrade plans and estimates under an unknown timetable. These plans and estimates were received from the Illinois Central Railroad on September 2, 1988, after Mrs. Rick's accident. The DOTD's failure to inquire about the status of the crossing upgrade constituted further operational negligence. The failure was not shown to be based on any policy considerations. Compare Simeon v. Doe, 618 So.2d 848 (La.1993).

EVIDENCE
The trial court's interpretation of 23 U.S.C. § 409 was in accord with this Court's subsequent opinion in Wiedeman v. Dixie Electric Membership Corp., et al, 627 So.2d 170 (La.1993). Wiedeman held that accident reports, traffic counts and other raw data collected by the DOTD are discoverable and admissible. That was what the trial court *1277 admitted into evidence here. There was no error.
The DOTD also complains about the trial court's refusal to allow evidence of the railroad's release into evidence. Under Code of Evidence Articles 408 and 413, the trial court correctly refused to admit into evidence the railroad's compromise and the amount paid in settlement.

RAILROAD FAULT
Because the railroad was not a party to the trial, no evidence was adduced about why the railroad delayed in responding to the DOTD's application for this crossing upgrade. The railroad's dilatory response may have resulted from the erroneous hazard index submitted by the DOTD. The record is too sparse for the railroad's fault to be quantified. The trial court correctly refused to assign any fault to the railroad.

QUANTUM
Plaintiffs' writ application was granted to consider the court of appeal's reduction of Mr. Rick's general damages from $400,000 to $300,000.
Acknowledging that Mr. and Mrs. Rick had a close relationship, the court of appeal decided that $450,000 was an abuse of discretion. (The court of appeal opinion incorrectly used the figure of $450,000 instead of $400,000.) An award of $300,000 was substituted. The court of appeal did not articulate any reasons for the lower award, as required by Reck v. Stevens, 373 So.2d 498 (La.1979).
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.

Youn v. Maritime Overseas Corp., 623 So.2d 1257 at 1261 (La.1993), petition for cert. filed (Dec. 13, 1993).
Mr. and Mrs. Rick had an unusually close partnership. They worked together everyday in the family business and were anticipating their retirement years together. The court of appeal erred in failing to give proper deference to the trier of fact's assessment of the general damages.

PREJUDGMENT INTEREST
The trial court awarded plaintiffs interest from the date of judicial demand under LSA-C.C. art. 2924. The court of appeal then applied LSA-R.S. 13:5112(C) to reduce the interest rate. Plaintiffs did not allege the unconstitutionality of LSA-R.S. 13:5112(C) at trial because the DOTD did not rely on the statute.
Since the DOTD relied on LSA-R.S. 13:5112(C) for the first time on appeal, plaintiffs' argument that it is constitutionally invalid should have been considered. As explained in Segura v. Louisiana Architects Selection Bd., 362 So.2d 498 (La.1978), and Chamberlain v. State Through DOTD, 624 So.2d 874 (La.1993), the limitation conflicts with Louisiana Constitution Article XII, § 10(A). Therefore, the court of appeal erred in reducing the interest rate.

DECREE
For the foregoing reasons, the judgment of the court of appeal is affirmed on the liability issue. The judgment of the court of appeal is reversed insofar as it reduced the award of general damages and the interest rate, and the judgment of the trial court is reinstated.
*1278 AFFIRMED IN PART; REVERSED IN PART; TRIAL COURT JUDGMENT REINSTATED.
CALOGERO, C.J., dissents and assigns reasons.
MARCUS, J., dissents.
CALOGERO, Chief Justice, dissents.
I do not agree that the Department of Transportation and Development assumed a duty to upgrade the off-system railroad crossing where the fatal accident occurred, which, according to the majority, made it unnecessary to consider whether an affirmative duty existed. In merely selecting for upgrading this railroad crossing, which did not involve roads or highways owned and maintained by the State of Louisiana, the DOTD did not assume a duty to assure that the Illinois Central Railroad Company, the owner of the site, would install active warning devices before injury occurred. The selection of the railroad crossing for upgrading was only the first step in an involved process to access federal funding for upgrade projects.[1] That step in no way provided the victim or any other commuter with an increased impression of security from the known hazard. Furthermore, I do not believe that the allocation of federal funding to the state to make railroad grade crossing improvements at approximately 35 of a possible 4000 crossings yearly imposes on the state a duty to provide protective devices at railroad crossings for off-system roads.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] Pursuant to Rule IV, Part 2, § 3, Lemmon, J. was not on the panel which heard and decided this case. See the footnote in State v. Barras, 615 So.2d 285 (La.1993).
[1] After the selection by the DOTD, approval for the project had to be obtained from the Federal Highway Administration, the site had to be jointly inspected by railroad and DOTD personnel, plans and estimates for the project had to be prepared by the railroad and forwarded to DOTD, the project notice had to be prepared by DOTD and sent to the railroad for approval, and the approved project notice had to be returned to the Maintenance Department of the DOTD from where it had to be sent to the FHA for final approval of the project. It is only after this final approval that the DOTD may prepare a work order, upon receipt of which, the railroad may begin installation.