895 So.2d 787 (2005)
Andrea BORDEN, Individually and as Natural Tutrix of Ashley Borden, Plaintiff-Appellant
v.
The KANSAS CITY SOUTHERN RAILWAY COMPANY, Al Spivey and City of Rayville, Defendants-Appellees.
No. 39,291-CA.
Court of Appeal of Louisiana, Second Circuit.
March 4, 2005.
*789 Thomas & Hardy, by Elizabeth S. Hardy, Lake Charles, Cotton, Bolton, Hoychick & Doughty, John Hoychick, John Hoychick, Jr., Rayville, for Appellant.
Office of Attorney General by Charles C. Foti, Jr., Jerald Lee Perlman, William E. Crawford, Jr., for Defendant/Appellee, State, DOTD.
Wilkinson, Carmody & Gilliam by Arthur R. Carmody, Jr., for Defendants/Appellees, KCS Railway and Albert Spivey.
Nelson, Zenter, Sartor, et al., by Fred Williams Sartor, Jr., Monroe, for Defendant/Appellee LA Insurance Guaranty Assoc.
Nelson, Zenter, Sartor, et al., by Fred Williams Sartor, Jr., Monroe, Coenen & Coenen by William Robert Coenen, Rayville, for Defendant/Appellee, Town of Rayville.
Before CARAWAY, MOORE and LOLLEY, JJ.
CARAWAY, J.
Because of a railroad crossing accident in which the plaintiff's spouse was killed, plaintiff sued the railroad and the municipality which owned the street where the accident occurred. By an amendment to the petition, the Louisiana Department of Transportation and Development ("DOTD") was made a defendant because of its actions under the federal railway-highway crossings program for this "off-system" crossing. As the result of discovery disputes, the trial court shielded from evidence certain DOTD reports and data collected for the purpose of the federal program pursuant to 23 U.S.C. § 409. The DOTD then moved for summary judgment asserting that the plaintiff could not show that the DOTD had assumed a duty relating to the safety of the crossing. The railroad also moved for summary judgment supported by certain DOTD documents. The railroad argued that the plaintiff's state tort claim regarding the adequacy of the passive warning signage for the crossing was preempted by federal law and regulation. The trial court granted both motions for summary judgment. We now amend the judgment dismissing the DOTD to recognize the dismissal as a judgment on the peremptory exception of no cause of action and to allow plaintiff the additional right to amend the petition under La. C.C.P. art. 934. Finding that the evidence in support of the railroad's summary judgment is insufficient to prove its affirmative defense of federal preemption, we reverse the ruling in favor of the railroad.

Facts
Plaintiff, Andrea Borden, is the surviving spouse of Sammie Borden ("Borden") and natural tutrix of the minor, Ashley Borden. She sued for damages resulting from a fatal collision between the truck her husband was driving and a train operated by Kansas City Southern Railway Company ("KCS") in downtown Rayville at 8:00 a.m. on May 25, 2000. The accident occurred when Mr. Borden attempted to cross at the Louisiana Street crossing in Rayville. His truck was struck by the oncoming train, ejecting him from the vehicle. He died at the scene from his injuries.
Immediately before Borden entered the crossing, he was driving on Benedette *790 Street, which also runs parallel to tracks on the opposite side, and turned left onto Louisiana Street. The intersection of Benedette Street and Louisiana Street is 42 feet from the crossing. The warning signs at the crossing consisted of reflectorized crossbucks and painted pavement markings; however the pavement markings were southeast of the intersection where Borden turned. The train was proceeding easterly towards Vicksburg.
KCS purchased the line in 1994 from Mid South Railroad, who acquired the line from Illinois Central Railroad in 1986. Beginning in 1996, KCS notified the Town of Rayville ("Town") that its trains' speeds would increase from 25 mph to 49 mph pursuant to federal regulations.
Plaintiff's discovery alleged that between 6 and 8 fatal accidents had occurred at the same crossing (Federal ID # 302-480-Y) since 1996. A second, nonfatal collision between an automobile and a train occurred later the same day of Borden's accident. The record reveals that an estimated 14 to 18 trains traversed the Louisiana Street crossing daily.
Matters of record also disclose that in 1995, KCS corresponded with Rayville's Mayor about the Town's safety concerns over the trains' increased speed, and recommended that the crossing either be closed or signalized with crossing arms and automatic signal lights. In 1998, the DOTD furnished a "project notice recommendation" that KCS "install flashing lights with gates and bells" at the crossing. The crossing upgrade project (which included crossings in eight other parishes) was bid in 1999, but the upgrade to the crossing in question did not occur until shortly after Borden was killed.
Borden's widow initially filed suit against KCS, the train conductor and the Town. Both KCS and the Town were alleged to maintain the custody and control of the road and railway intersection. The petition alleged that the accident was caused by inadequate warning devices, employee negligence, changes in conditions under which trains operated, excessive speed, inadequate sight distance and other factors which created an unreasonably dangerous crossing. The Town's alleged negligence consisted of maintaining an unreasonably dangerous intersection at the crossing, and its failure to warn motorists of such condition.
On May 23, 2001, plaintiff amended the petition to name the DOTD as a defendant, alleging its involvement with the Louisiana Street crossing because of the federally funded program for crossing safety and its knowledge of numerous prior accidents at the crossing, which demonstrated the unreasonable risk of harm presented by the crossing. DOTD answered, alleging that the intersection in question constituted an "off-system crossing," which is a roadway that is not owned by the state. It is undisputed in this case that Louisiana Street is owned by the Town.
KCS answered the petition, and pled the affirmative defense of federal preemption. Plaintiff's subsequent discovery requests propounded to KCS included interrogatories and requests for production seeking information relating to KCS's anticipated use of either the federal preemption defense or federal evidentiary privilege through which certain documents and information might be shielded from discovery. Specifically, the interrogatories requested the particular statutory or regulatory source of such preemption or privilege, and a description of the data and/or documents for which KCS would assert the privilege. Plaintiff further requested the documents upon which KCS would presumably rely to prove receipt of federal funds required to establish preemption. As to the warning device installed at the *791 Louisiana Street crossing, plaintiff requested the following:
55. If the Federal Highway Administration (FHWA) and/or the Louisiana Department of Transportation and Development (La.DOTD) have approved (in any manner) the type of warning device(s) installed at the Louisiana Street Crossing on May 25, 2000, please provide all documentation which contains any information or reference to the FHWA and/or the La. DOTD approval of the warning device(s), including, but not limited to, documents which contain the following information:
(a) Description of the warning device(s) installed at the Louisiana Street Crossing;
(b) Date the warning device(s) was installed;
(c) Who installed the warning device(s);
(d) What was the cost of the warning device(s) installed at the Louisiana Street Crossing;
(e) Who paid for the warning device(s) installed at the Louisiana Street Crossing;
* * * * * *
In January 2002, plaintiff filed a rule to show cause to compel discovery responses from KCS. The trial court conducted a hearing on the matter on February 22, 2002. At the close of the hearing, the trial court ordered KCS to further answer some of plaintiff's interrogatories in accordance with its oral instructions given at the hearing. Although 23 U.S.C. § 409 was discussed at the hearing, the trial court made no specific ruling under which evidence would be excluded from discovery because of that statute.
After a similar dispute with the DOTD, the plaintiff moved to compel DOTD's responses to their discovery requests and a hearing occurred on November 14, 2003. After an in camera inspection of DOTD's material, the trial court ruled that "all documentation and requests with the exception of interrogatories 7 and 8 are privileged and not discoverable." DOTD's exhibits 1-12 were filed into evidence and ordered sealed. Those records have not been designated a part of the appellate record.
The trial court's judgment denying plaintiff's motion to compel against DOTD stated the following:
After review of Plaintiffs' Request for Production and Interrogatories propounded on the Louisiana DOTD on November 13, 2001, review of the discovery responses filed by the La. DOTD on October 30, 2003, review of the briefs and evidence submitted by the parties, the Court specifically finds the documents submitted by the La. DOTD for the In Camera Inspection were collected and/or amassed for safety purposes under 23 USC 130 and/or other federal rail safety programs and are privileged under 23 USC 409, and further with respect for each Request for Production and Interrogatory that the La. DOTD refused to provide the documents and/or information and to which the La. DOTD asserted the privilege of 23 USC 409, the Court further specifically finds that the documents and information sought by plaintiffs was amassed and collected for safety purposes under 23 USC 130 and/or other federal rail safety programs and that the La. DOTD properly asserted the privilege under 23 USC 409.
Two weeks after the DOTD hearing, defendant KCS moved for summary judgment and alternatively, a motion in limine to preclude evidence concerning the adequacy of warning devices. KCS's counsel supported the motion for summary judgment *792 with his own affidavit which identified various documents obtained from DOTD and other sources. This information indicated that federal funds were used in 1981 for the installation of the warning devices and signage at various crossings in the Town and along KCS's line, including the Louisiana Street crossing. The documents had been obtained by counsel in other litigation against DOTD and KCS, including the case which was the subject of this court's ruling in Ghrigsby v. Kansas City Southern Ry., 38,988 (La.App.2d Cir.10/29/04), 888 So.2d 961, writ denied, 04-2897 (La.2/4/05), 893 So.2d 885. DOTD also moved for summary judgment based on the preclusion of evidence under 23 U.S.C. § 409 and its lack of duty of care for the off-system crossing.
In response, plaintiff moved for summary judgment and moved to strike defendant's "affirmative defense of preemption of inadequate warning devices" and the exhibits attached to the KCS affidavit. All of the motions were argued before the trial court on February 20, 2004.[1] At the conclusion of the hearing, the trial court relied on Furlough v. Union Pacific R.R. Co., 33,658 (La.App.2d Cir.8/31/00), 766 So.2d 751, writ denied, 00-2929 (La.1/12/01), 781 So.2d 556, to find that "federal funds were utilized to install the warning signs in question, the signs were in place on the date of the accident and the FHWA approved the Louisiana Street crossing project." The court dismissed plaintiff's motion for summary judgment and motions to strike, and granted KCS's and DOTD's motions for summary judgment.[2] It is from these judgments that plaintiff appeals.

Discussion
Since the decision in Norfolk Southern Ry. Co. v. Shanklin, 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000), this court on two occasions has addressed railroad crossing accidents and the federal preemption of state tort law for such accidents. Ghrigsby v. Kansas City Southern Ry., supra; Furlough v. Union Pacific R.R. Co., supra. In those rulings, federal preemption was found to apply which barred tort claims against the DOTD in Ghrigsby and the defendant railroad in Furlough.[3] Additionally, the Louisiana Supreme Court has addressed the scope of evidence pertaining to railroad crossings subject to the shield of 23 U.S.C. § 409 (hereinafter "Section 409"). Palacios v. Louisiana and Delta R.R. Inc., 98-2932 (La.7/2/99), 740 So.2d 95. That statute states that "reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of ... railway-highway crossings, pursuant to sections 130, 144, and 152 of the title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a *793 Federal or State court proceeding ... arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data."
In this case, the plaintiff asserts that the defendants used the shield of Section 409 to prevent discovery of documentation for this railroad crossing, while attempting through their motions for summary judgments to urge the federal preemption which can only be established by such documentation. Because of this asserted conflict between the inadmissibility of Section 409 evidence and the burden of proof for federal preemption, we will initially review Shanklin and Palacios. Following that review, we will then consider whether the summary judgment in favor of each defendant was correct.
The ruling of the United States Supreme Court in Shanklin addresses a state tort claim against a railroad for its failure to maintain adequate warning devices at a crossing. The railroad claimed that the state tort law was preempted by federal law. The court reviewed the federal statutes and safety regulations, in particular, the Federal Highway Administration's ("FHWA") regulations implementing the Federal Railway-Highway Crossings Program ("Crossings Program") created by the Highway Safety Act of 1973. The Crossings Program makes funds available to a state for the "cost of construction of projects for the elimination of hazards of railway-highway crossings." 23 U.S.C. § 130(a). To participate in the Crossings Program, a state must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." § 130(d). That schedule must, "[a]t a minimum, ... provide signs for all railway-highway crossings." Id.
The two regulations which the railroad asserted as the basis for preemption in Shanklin addressed the warning devices that were required as a part of all federally funded crossing improvements. 23 C.F.R. § 646.214(b)(3) and (4). Subsection (b)(3) of the regulation requires the installation of automatic gates with flashing light signals for high risk crossings identified by specific criteria listed therein. Subsection (b)(4) provides for all crossings not covered by Subsection (b)(3) and allows for non-active warning devices or signage selected by the state agency or railroad, "subject to the approval of FHWA."
Reviewing these regulations and its prior decision in CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), the court determined that the regulations were applicable to all warning devices actually installed with federal funds so as to preempt any state tort claim asserting their inadequacy. Thus, the advanced warning signs and reflectorized crossbucks installed for the crossing in Shanklin pursuant to Subsection (b)(4) of the regulations could not be challenged under the state tort law. In reaching this conclusion, the high court explained:
Respondent also argues that pre-emption does not lie in this particular case because the Oakwood Church Road crossing presented several of the factors listed in § 646.214(b)(3), and because the TDOT did not install pavement markings as required by the MUTCD. See Brief for Respondent 20-22, 36; Brief in Opposition 6-8. This misconceives how pre-emption operates under these circumstances. When the FHWA approves a crossing improvement project and the State installs the warning devices using federal funds, §§ 646.214(b)(3) and (4) establish a federal *794 standard for the adequacy of those devices that displaces state tort law addressing the same subject. At that point, the regulation dictates "the devices to be installed and the means by which railroads are to participate in their selection." Easterwood, supra, at 671, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387. It is this displacement of state law concerning the devices' adequacy, and not the State's or the FHWA's adherence to the standard set out in §§ 646.214(b)(3) and (4) or to the requirements of the MUTCD, that pre-empts state tort actions. Whether the State should have originally installed different or additional devices, or whether conditions at the crossing have since changed such that automatic gates and flashing lights would be appropriate, is immaterial to the pre-emption question.
Shanklin, 529 U.S. at 357, 120 S.Ct. 1467.
The present case involves not only a railroad defendant but also the state agency, the DOTD. Under Louisiana jurisprudence, the DOTD has been held liable for certain off-system railroad crossing accidents under an assumption of duty theory as discussed in detail below. The DOTD does perform certain responsibilities regarding off-system crossings under the federal highway safety improvement program. That program is directed to the states and is the topic of regulations contained in 23 C.F.R. § 924.1, et seq., which includes safety directives for the Crossings Program. Section 924.5 provides that "[e]ach State shall develop and implement, on a continuing basis, a highway safety improvement program which has the overall objective of reducing the number and severity of accidents and decreasing the potential for accidents on all highways." Section 924.9(a)(4) provides as follows:
(a) The planning component of the highway safety improvement program shall incorporate:
* * *
(4) A process for establishing priorities for implementing highway safety improvement, projects, considering:
(i) The potential reduction in the number and/or severity of accidents,
(ii) The cost of the projects and the resources available,
(iii) The relative hazard of public railroad-highway grade crossings based on a hazard index formula,
(iv) Onsite inspection of public grade crossings,
(v) The potential danger to large numbers of people at public grade crossings used on a regular basis by passenger trains, school buses, transit buses, pedestrians, bicyclists, or by trains and/or motor vehicles carrying hazardous materials, and
(vi) Other criteria as appropriate in each State.
Each state must have a process to evaluate the program's effectiveness and costs (Section 924.13) and file yearly reports with the FHWA which "shall report on the progress made in implementing... the grade crossing improvement program." 23 C.F.R. § 924.15. Despite this extensive regulatory framework, the court in Shanklin concluded "that the regulations contained in 23 C.F.R. pt. 924 (1999), which `establish the general terms of the bargain between the Federal and State Governments' for the Crossings Program, are not pre-emptive." Shanklin at 529 U.S. at 352, 120 S.Ct. 1467. Nevertheless, as we will next review, the effect of Section 409 upon the information gathered by DOTD under the federal program is significant.
The second ruling which is important for this decision is Palacios, which reviewed *795 the scope of protection of the privilege of Section 409. Section 409 specifically references 23 U.S.C. § 130 and shields from introduction as evidence data pertaining to the elimination of hazards of railway-highway crossings as collected or compiled by a state agency.
In Palacios, the DOTD asserted the privilege and the inadmissibility of evidence under Section 409 relating to the DOTD's monitoring of an off-system railroad crossing pursuant to the federal railroad safety program. Similar to this case, the DOTD moved for summary judgment "arguing that the intersection at issue is not part of the state highway system, and that the state has not assumed contractual responsibility for the intersection, so that the state is not responsible for its safety and maintenance." Id. at 96. In the plaintiff's attempt to oppose this position, DOTD raised the shield of Section 409 to prevent discovery of evidence relating to DOTD's monitoring of the crossing under the federal safety program. As in this case, the plaintiff argued that the DOTD's positions were contradictory.
In opposing the discovery of the evidence under Section 409, the DOTD officials in Palacios"testified that the state's information on the Monnet intersection, as well as every railroad crossing in the state, is collected in order to comply with federal law concerning federal highway and railroad safety." William Shrewsberry of the DOTD testified that because the crossing was an off-system crossing, "any file the state DOTD has on the crossing only exists because of this federal railroad safety program." From that evidence, the trial court determined that the information sought by plaintiff was protected by Section 409.
After reviewing the congressional intent for the statute, the Louisiana Supreme Court affirmed the trial court's ruling, making the following pronouncement which has considerable importance for this case:
It is evident that the state, while claiming no responsibility for the maintenance and safety of the Monnet Road crossing to date, is still required to include this crossing in its ongoing general surveys of all grade crossings in the state. Thus, we do not find the positions taken by the state in its motion for summary judgment and in its opposition to plaintiff's motion to compel discovery, to be contradictory.
* * *
There is no requirement, as the court of appeal apparently believed, that the state prove that the information compiled is linked to a particular federally funded safety project in order to qualify for the privilege established by the portion of section 409 that is at issue in this case. To the contrary, the information gathered by the state as part of its general examinations of all railroad crossings in the state, in order for the appropriate state and federal administrators to determine which crossings may need improvement and to qualify for federal funding for these improvements, falls within the protective scope of section 409. Thus, we see no error in the trial court's ruling that the data at issue is privileged.
We find that the DOTD has sufficiently established that the information sought by the plaintiff was assembled as part of a federal railway safety program, intended to aid the state and federal governments in identifying, evaluating and planning its railroad crossing safety enhancement needs, as mandated by 23 U.S.C. § 130(d), so as to trigger the application of 23 U.S.C. § 409. Thus, the information sought by the plaintiff on the Monnet Road crossing, whether *796 from the DOTD's file on that intersection, or the Louisiana Highway Safety Commission's federally-funded accident information database, is privileged. Such a result is consistent with the purpose of section 409, which is to encourage states to actively and thoroughly investigate the railroad crossings within their borders, free from the fear that data compiled to serve this purpose might be later used to establish tort liability.
Palacios, supra at 101-102.

Summary Judgment Dismissing DOTD
Plaintiff's amended petition made two claims against the DOTD. The first claim, which disputes the adequacy of the warnings signage, is summarized in amended paragraph 9C, which states:
If the STATE OF LOUISIANA accepted and used federal funds on a warning device at the Louisiana Street Crossing prior to the collision at issue, then the acceptance and use of federal funds under 23 CFR 646.214(b)(3)(4) constituted an assumption of the responsibility to properly sign the Louisiana Street Crossing under the mandates of 23 CFR 646.214(b)(3)(4) and otherwise make the crossing safe for the motoring public.
The second claim asserted in amended paragraph 9D alleges prior accidents at the Louisiana Street crossing and asserts that the conditions at the crossing "posed an unreasonable risk of harm." Plaintiff then charges that the DOTD was advised of the unreasonably dangerous condition of the crossing and was requested by the Town to remedy the danger.
In response to DOTD's motion for summary judgment, plaintiff bolstered this second claim by submitting copies of correspondence and reports between the Town, the DOTD and KCS. These documents were apparently discovered by plaintiff in the files of the other defendants and may or may not have been included with the documents which were the subject of the trial court's in camera review of the records and excluded under its Section 409 ruling.
In early 1996, the mayor of Rayville notified DOTD that the Louisiana Street crossing was one of three "extremely dangerous for motorists," to which the DOTD responded by recommending that the crossing be closed. The Town declined to close the crossing. Thereafter, the Town formed a special committee for the purpose of meeting with representatives of KCS and DOTD regarding safety concerns about several crossings, and specifically invited William Shrewsberry to attend the meeting.
By a DOTD letter to KCS dated May 12, 1998, and signed by Shrewsberry, DOTD transmitted its "On-Site Inspection Check List and Recommendations" dated April 23, 1998, pertaining to the Louisiana Street crossing. The document described the condition of the crossing and its existing warning devices. It recommended the installation of flashing lights with gates and bells for the crossing. Shrewsberry's letter requested that KCS prepare plans and estimates for this work in accordance with a 1976 "Master Agreement" between DOTD and the railroad. DOTD would prepare a "Project Notice" upon KCS's providing it with the plans and estimates.
By letter dated April 9, 1999, DOTD transmitted to KCS the "Project Notice" dated December 12, 1998, for the Louisiana Street crossing. The estimate for the installation of active warning devices was listed at $141,062. The Project Notice was signed by DOTD and KCS officials and although a signature blank was included for execution by the FHWA division administrator, it was not completed. It was agreed construction would be performed in *797 accordance with the 1976 Master Agreement. The DOTD's letter authorized KCS to begin the assembly of materials and stated that KCS's commencement of work could begin following 48-hour notification to DOTD. The letter concluded by stating that upon KCS's completion of the installation, and after final inspection by DOTD and all field adjustments, KCS's statements for reimbursement of costs were to be submitted to DOTD for payment.
Lastly, KCS's Request for Quotation dated July 29, 1999, solicited "a firm price and delivery for Grade Crossing Control Packages" and obtained suppliers' quotes for three crossings, including Louisiana Street. The accident occurred on May 25, 2000, shortly before the crossing was upgraded.
Notably, in plaintiff's other allegations against KCS and the Town, only those defendants are alleged to be in the custody and control of the crossing's two intersecting right-of-ways. As indicated above, it is undisputed that the Louisiana Street crossing is an "off-system crossing" and the roadway is not owned by the state.
Ownership or custody of a thing, which in this case is an immovable roadway or railroad right-of-way, brings with it responsibility in tort for damages occasioned by a defect in the thing. La. R.S. 9:2800; La. C.C. art. 2317 and 2317.1. Additionally, with regard to the signing of a roadway, La. R.S. 32:235(B) requires that "[l]ocal municipal and parish authorities in their respective jurisdictions shall place and maintain such traffic control devices upon highways under this jurisdiction." From this authority, the Town's jurisdiction and ownership/custody of the roadway and KCS's ownership of its right-of-way would place duties upon them for maintaining the safety of the intersection which may serve as the basis for a tort claim against them. However, such duties of the custodian/owner are not placed on the DOTD. Laque v. St. Charles Parish, 444 So.2d 742 (La.App. 4th Cir.1984).
Beyond this first tier of tort responsibility, the state nevertheless has been held liable for the safety of an off-system railroad crossing under a theory of assumed duty. Archon v. Union Pacific R.R., 94-2728, 94-2743 (La.6/30/95), 657 So.2d 987, on reh'g, 675 So.2d 1055; Rick v. State, Dept. of Transp. and Dev., 630 So.2d 1271 (La.1994). Both the Archon and Rick rulings involved DOTD's actions pursuant to the federal safety improvement program, but were antecedent to the court's ruling in Palacios. Additionally, from the facts in Archon and Rick, federal funds had not been spent on safety devices at the crossing prior to the accidents so that federal preemption under Shanklin was not applicable.
In this case, since plaintiff cannot establish DOTD's ownership/custody of the off-system Louisiana Street crossing, the question presented is whether plaintiff has alleged in her pleadings, or shown through her opposition to DOTD's motion for summary judgment, facts demonstrating that DOTD assumed a duty with regard to the crossing and was negligent in the fulfillment of that duty. Before answering that question, however, certain procedural issues raised by plaintiff will be addressed.
Plaintiff points out that DOTD's motion for summary judgment was unaccompanied by evidence in the form of affidavits, depositions or answers to discovery. In fact, DOTD was successful in preventing discovery of certain data documenting its actions in connection with the Louisiana Street crossing which was reviewed in camera by the trial court and barred as evidence under Section 409. Moreover, the prior ruling of this court in Ghrigsby requires that any claim of federal preemption *798 be raised as an affirmative defense, with the burden of proof at trial and for purposes of summary judgment resting on the defendant. Ghrigsby, supra at 964-965.
In Bush v. Fidelity & Deposit Co. of Maryland, 516 So.2d 1199 (La.App. 2d Cir.1987), this court made the following observation in reviewing the trial court's dismissal of plaintiff's case by a summary judgment:
While we agree with the trial court's result, we note that summary judgment may not substitute for the peremptory exception of no cause of action and may not be granted because of the insufficiency of allegations. Wells v. St. Tammany Parish School Bd., 340 So.2d 1022 (La.App. 1st Cir.1976). Compare Owens v. Martin, 449 So.2d 448 (La.1984). Summary judgment is a final and definitive judgment. CCP Arts. 1841, 1842. The sustaining of an exception of no cause of action is not final because a plaintiff may be allowed to amend. Compare CCP Arts. 934, 968.
After making that observation, this court proceeded to set aside the summary judgment and, in its place in defendant's favor, granted the exception of no cause of action pursuant to the appellate court's power under La. C.C.P. arts. 927 and 2163. The case was remanded to allow the plaintiff the opportunity to attempt to allege a cause of action by amendment under La. C.C.P. art. 934.
From our review of the plaintiff's pleadings, as expanded by the additional fact allegations in her opposition to the motion for summary judgment, we likewise find an insufficiency of allegations in this case so that the exception of no cause of action will serve as the basis for DOTD's dismissal. DOTD was not required to prove the affirmative defense of preemption until the plaintiff alleged a cause of action. As indicated above, plaintiff was required to show that the non-custodial DOTD assumed a duty concerning this crossing. The following review of plaintiff's claims shows that a cause of action has not been presented.
Not surprisingly, plaintiff's first claim quoted above in amended paragraph 9C tepidly begins with the word "if." If, prior to the accident, DOTD in fact "negligently administered the federal funding program by allowing the expenditure of federal funds on a warning device at the Louisiana Street crossing without complying with the mandates of federal law," as plaintiff alleges, then Shanklin holds that the inadequacy of the warning device and any misapplication of the regulations under 23 C.F.R. § 646.214(b)(3) and (4) cannot be scrutinized under state tort law and that issue is preempted by federal law. This court in Ghrigsby has extended such federal preemption to the DOTD so that on the face of plaintiff's allegations contained in amended paragraphs 9A-9C, which refers to the passive warning signs that were in place, no cause of action exists "if" federal funds were used for those warning signs.
Plaintiff's second claim, as expanded by the evidence of DOTD's participation before the accident in the planning for the crossing's upgrade, presents a closer issue. Nevertheless, from our review of the rulings of the Louisiana Supreme Court in Archon and Palacios, we do not find that plaintiff has shown that DOTD assumed a duty to upgrade the Louisiana Street crossing because its actions were clearly performed as the facilitator of the federal railway safety program.
Archon, supra, the last ruling of our highest court regarding DOTD's assumption of a duty for an off-system crossing, was composed of two separate opinions. The original opinion, authored by Chief Justice Calogero, was later appended by a rehearing opinion authorized by Justice Watson. The opinion on rehearing states *799 that it "was granted to reconsider the duty issue," yet the opinion did not change the result of the original opinion.
The DOTD in Archon was held liable for 22% of the fault for an accident which occurred at an off-system crossing on a parish road. In the original opinion, the court summarized the questions presented and its conclusion as follows:
DOTD and the plaintiffs filed applications for writs with this Court. The Court granted both writ applications and heard arguments in the matter. What in part interested the Court was the fact that this case was perhaps distinguishable from Rick v. State, DOTD, Nos. 93-1776 and 93-1784 (La.1/14/94), 630 So.2d 1271. In Rick, DOTD allowed a seventeen-month delay after the site was inspected before securing the upgrade plans and estimates from the railroad; in this case, only a few months had passed after inspection before such response was obtained. Upon review of the record and the judgment below, we determine that this distinction, however valid, is of no solace to DOTD, for it has now become apparent that the court of appeal properly affirmed DOTD's liability and its 22% causative fault because DOTD had assumed a duty at a much earlier time regarding the Van-Ply crossing, the breach of which contributed to Archon's accident.
Archon, 657 So.2d at 990.
The DOTD's assumption of the duty recognized by the court in the original Archon opinion resulted from an early agreement between the state and the railroad in 1964 and, as in this case, a 1976 "Master Agreement."[4] Referring to the 1964 agreement, the court noted that the state agreed to improve the crossing "and maintain any advance warning system which may be required." The original opinion concluded:
By means of the 1964 Agreement and the 1976 statewide agreement, DOTD expressly assumed the responsibility for providing such warning devices at this crossing. Because we find that DOTD contractually assumed a duty regarding this crossing, we need not consider plaintiffs' arguments that DOTD assumed a duty merely because of its acceptance of federal funds in the early 1980s to upgrade off-system crossings or because of its eventual selection of the site for upgrade in 1989.
Archon, 657 So.2d at 992.
On rehearing in Archon, instead of focusing on the DOTD's contractual assumption *800 of duties under the 1964 and 1976 agreements, the opinion emphasized the DOTD's negligent performance in 1983 when it first issued a Project Notice. Although the DOTD had been recommending active warning devices, the Project Notice did not. Thus, since the DOTD failed to accurately follow up on its own recommendation for the upgrade, the active signals were not installed until after the fatal accident in 1989. From our review of Archon, the greater emphasis on rehearing, which "was granted to reconsider the duty issue," was on DOTD's assumption in 1983 of the duty of upgrading the crossing pursuant to its role as the administrator of the federal funding scheme under the Crossings Program.
Unlike the original opinion in Archon which was a unanimous ruling of the court, the opinion on rehearing had three dissenting justices. Although the author of the original opinion, Chief Justice Calogero, apparently did not dissent to the rehearing opinion, he had specifically noted in the original opinion his dissent in the court's earlier ruling in Rick, supra. In that case which also involved an off-system crossing, the Chief Justice dissented, stating:
In merely selecting for upgrading this railroad crossing, which did not involve roads or highways owned and maintained by the State of Louisiana, the DOTD did not assume a duty to assure that the Illinois Central Railroad Company, the owner of the site, would install active warning devices before injury occurred.
Id. at 1278.
From our review of the negligence of the DOTD determined in Archon, the plaintiff has not pled in this case nor shown by the evidence of DOTD's activities in 1999 that the DOTD assumed a duty regarding the Louisiana Street crossing and was negligent in fulfilling its role of implementing the federal highway safety improvement program and the Crossings Program. In the amended petition by which the DOTD was included in this action and in her argument to this court, plaintiff continues to assert on information and belief that the passive warning signals, which were present at the time of the accident, were installed in 1981 with the use of federal funds and the involvement of DOTD under the federal program. By this court's ruling in Ghrigsby, federal preemption under Shanklin would therefore apply regarding the warnings "whether conditions at the crossing have since changed such that automatic gates and flashing lights would be appropriate." Shanklin, supra at 358, 120 S.Ct. 1467. Moreover, the recognition in Palacios of the underlying policy of Section 409 "to encourage states to actively and thoroughly investigate the railroad crossings within their borders, free from the fear that data compiled to serve this purpose might be later used to establish tort liability," indicates to us that the imposition of a duty upon the DOTD merely because of its involvement in the federal Crossings Program would thwart that policy. The owners and custodians of the crossing, in this case the Town and KCS, are responsible for its safety and accountable under Louisiana tort law in the absence of federal preemption. The DOTD, which has administrative duties under the federal program, has not been alleged or shown in this case to have assumed or breached a duty that would make it responsible in tort.
Accordingly, while we affirm the trial court's judgment dismissing the DOTD, we do so on the recognition that plaintiff has failed to allege a cause of action against the DOTD. Because of the Archon ruling, however, we are constrained to allow plaintiff *801 an attempt to amend the petition within thirty days of the finality of this judgment. La. C.C.P. art. 934. Plaintiff is required to allege actions or inactions by the DOTD which negligently prevented or impeded KCS or the Town in providing for the safety of the Louisiana Street crossing.

Partial Summary Judgment  KCS
Appellant argues that KCS filed irrelevant and inadmissible documents in support of its motion for partial summary judgment, and failed to prove that federal funds were used to upgrade the crossing in question. In its motion, KCS argued that "because federal funds participated in the installation of the warning devices at the subject crossing, federal law completely covers the subject matter of warning devices at the crossing and preempts state law in this area as a basis of liability." At issue in this proceeding is the substance of the affidavit used in support of the motion. KCS' attorney of record, Arthur R. Carmody, Jr., subscribed to the affidavit, and stated that "upon personal knowledge ... the following documents ... have been received by [him] either directly from the DOTD, or in sworn pleadings attested to by the DOTD in other litigation."
The documents focused on State Project No. 737-04-15 for railway-highway grade crossing signs in Highway District 05, comprised of nine parishes including Richland. The inception of the project occurred on September 7, 1979, when the DOTD entered into a contract with Sigma Service Corporation. The DOTD's letter to town mayors stated that the project was "making use of Federal Aid Highway Safety Act Funds to provide Railroad Advance Warning Signs and Railroad Crossbuck Warning Signs to all railway grade crossings on local roads and streets." The Project Certification alleged that the project was completed by February 27, 1981, and accepted by the DOTD on April 21, 1981. KCS also attached excerpts from the DOTD field book showing the installation at Crossing 302-480-Y of two advance signs on December 22, 1980, and two crossbuck signs on January 21, 1981. A copy of a U.S. DOT-Crossing Inventory Information Form identified the location of the crossing as Louisiana Street in Rayville. Finally, the Carmody affidavit included a copy of Shrewsberry's affidavit from the district court proceedings in Ghrigsby, which KCS argued related to the same state project, and a facsimile cover sheet from Shrewsberry to Carmody in connection with proceedings in another crossing accident in Richland Parish.
Regarding the use of affidavits for summary judgment, La. C.C.P. art. 967(A) provides, in pertinent part, as follows:
A. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith....
Under this article, personal knowledge means something which a witness actually saw or heard, as distinguished from something a witness learned from some other person or source. Panameno v. Louisiana Riverboat Gaming Partnership, 36,172 (La.App.2d Cir.10/23/02), 830 So.2d 489; cf. Atkins v. Shilo Enter., Inc., 39,100 (La.App.2d Cir.12/15/04), 889 So.2d 487.
A review of the evidence used to support KCS's partial summary judgment reveals multiple problems indicating that the trial court's ruling must be reversed. First, it is not entirely clear from the documentation that the passive warning signs for the Louisiana Street crossing resulted from approval of the FHWA and the use of *802 federal funds. Second, the Carmody affidavit attempts to authenticate and verify DOTD documentation which was information that was clearly learned by Carmody from another source and thus beyond his personal knowledge in violation of La. C.C.P. art. 967(A). Third, and most significantly, the discovery disputes between plaintiff and the two defendants involved in this appeal did cause the DOTD documentation to be shielded under Section 409. It is that same documentation that KCS now asserts in support of its affirmative defense of federal preemption. Fairness demands that the plaintiff be given the opportunity to cross-examine the authors or custodians of those documents through discovery and/or at trial. This court's affirmance of the ruling dismissing the DOTD may require that the trial court's ruling excluding certain DOTD documentation under Section 409 be revisited. The evidence is no longer sought in discovery to be "admitted into evidence" against the public agency, thus the application of Section 409 arguably may no longer be pertinent to shield relevant evidence of the non-party DOTD witnesses.

Conclusion
For the foregoing reasons, we affirm the trial court's dismissal of the DOTD, but amend the judgment to grant the peremptory exception of no cause of action. Within thirty days of the finality of this judgment, plaintiff may amend the petition under La. C.C.P. art. 934 to state a cause of action in conformity with the rulings expressed herein. The trial court's grant of the partial summary judgment in favor of KCS is reversed. Costs of appeal are assessed to KCS.
JUDGMENT AMENDED, AND AS AMENDED, AFFIRMED IN PART AND REVERSED IN PART.
MOORE, J., concurs in part and dissents in part with written reasons.
MOORE, J., concurs in part and dissents in part.
I subscribe to the majority's analysis of the summary judgment in favor of KCS. The affidavit of learned counsel, though likely factual, is not based on personal knowledge and thus is incompetent as evidence to support the motion for summary judgment.
I must respectfully dissent, however, from the majority's treatment of the summary judgment in favor of DOTD. In a process that smacks of judicial activism, the majority has transformed DOTD's motion into an exception of no cause of action. True, there is some authority for invoking this expedient to skirt the finality of a summary judgment. Bush v. Fidelity & Deposit Co. of Maryland, supra; Green v. Harrah's Casino, 34,224 (La.App. 2 Cir. 12/20/00), 774 So.2d 1174.
The far better rule, however, is that a motion for summary judgment based on insufficiency of allegations cannot be used as a substitute for an exception of no cause of action. Noble v. Armstrong, 93-841 (La.App. 5 Cir. 3/16/94), 635 So.2d 1199. The principle is perhaps best expressed by this court in Steed v. St. Paul's United Methodist Church, 31,521 (La.App. 2 Cir. 2/24/99), 728 So.2d 931, writ denied, 99-0877 (La.5/7/99), 740 So.2d 1290, at 939-940:
Again, we are obligated to construe the exception by its substance, not the title supplied by the litigant. * * * Steed's argument cannot be possibly construed as denying the legal sufficiency of Rev. Simmons's reconventional demand; her only genuine claim is prematurity. * * *
Admittedly, the appellate court may supply an exception of no cause ex proprio motu. La. C.C.P. art. 927 B. After *803 close consideration, however, we perceive nothing in the procedural history of this case, or in the evidence, to warrant such an exercise of our discretion. In the first place, the true import of the exception is prematurity, which was waived. Second, Steed never challenged the legal sufficiency of Rev. Simmons's claim prior to or during trial and did not brief the issue, raising it only by way of asking this court to notice it on our own motion; we are loath to supply an extraordinary remedy without argument from the opponent or a ruling by the trial court.
Like Ms. Steed, DOTD never challenged the sufficiency of the plaintiff's petition; it only pointed out to the court an absence of factual support for an element essential to Ms. Borden's claim. This record provides no reasonable basis for treating DOTD's motion as anything other than what it is, a request for summary judgment.
Summary judgment procedure invites the submission of documentary evidence; in striking contrast, the exception of no cause of action is decided solely on the face of the pleadings. La. C.C.P. art. 927; Roberts v. Sewerage & Water Bd. of New Orleans, 92-2048 (La.3/21/94), 634 So.2d 341. The majority catalogues a plethora of documents which it deemed useful in noticing the absence of a cause of action. This procedure plainly runs afoul of Art. 927, and is patently unfair to the litigants. Neither Ms. Borden nor DOTD could have expected that any court would expand the pleadings with evidence on an exception of no cause. As in Steed, nobody knew that this was even the issue before the court.
Moreover, on the exception of no cause, the court must accept any well-pleaded fact in the petition as true. Id. Ms. Borden's supplemental and amended petition, ¶ 9C, is tentative and somewhat inartfully drafted, yet it alleges that DOTD "accepted and used federal funds on a warning device at the Louisiana Street Crossing" and that this "constituted an assumption of the responsibility to properly sign" that crossing under federal guidelines. In my view, this states a cause of action for the assumption of duty.
I would not notice, ex proprio motu, any failure to state a cause of action, and would not remand the case for amendment of the petition. For these reasons, I respectfully dissent.
NOTES
[1] Plaintiff's Opposition to the Town of Rayville's Motion for Summary Judgment which was also considered by the trial court is contained in the record on appeal; the trial court ultimately denied the Town's motion.
[2] KCS states that its motion was for partial summary judgment limited to the issue of the adequacy of the warning devices and federal peremption. The judgment was certified by the trial court under La. C.C.P. art. 1915(B).
[3] In Long v. State, Through the Dep't of Transp. and Dev., 37,422 (La.App.2d Cir.11/24/03), 862 So.2d 149, writ granted, 04-0485 (La.5/7/04), 872 So.2d 1068, this court did not review the consequences of Shanklin and the federal preemption, nor did we review the assumption of any duty by the DOTD for the off-system crossing involved in that case. The case remains pending before the Louisiana Supreme Court.
[4] The 1976 Master Agreement in Archon, like the present case, appears to have resulted because of the federal Crossings Program and was described by the court as follows:

This agreement provided that specific project improvements under the Agreement would be initiated by the Department's serving on the Company a "Project Notice." DOTD and the Railroad were to make a joint inspection of each site and mutually agree on the proposed improvements. The Railroad was obligated to prepare plans and estimates for the work, subject to DOTD's approval. After the work was completed, a joint inspection of the site would be made. In another provision, the Department agreed to furnish, install, and maintain at its own expense any "`Railroad Advance Warning' signs which may be required [prior to the placement of] ... Railroad Grade Crossing Warning Devices installed under the respective `Project Notice.'"
* * *
As a result of this agreement, the Department obligated itself to initiate upgrade projects at various sites throughout the state by means of Project Notices to the Railroad, to inspect each selected site, and to review and approve plans for each project. In addition, the Department obligated itself to furnish and install railroad warning signs in that interim period after warning devices were deemed necessary and prior to their installation.