| TRAYLOR, J.
We granted certiorari to determine two issues: (1) whether 23 U.S.C. § 409 precludes the admission of correspondence between the State of Louisiana, through the Department of Transportation and Development (hereinafter “DOTD”) and a municipality regarding proposed upgrades to a roadway/railroad crossing owned by the municipality; and (2) whether the DOTD automatically assumes a duty to maintain a non-state owned crossing solely by selecting the crossing for a proposed upgrade.
FACTS AND PROCEDURAL HISTORY
Qn September 10, 1997, Betty Long was driving her car across a railroad crossing on Harp gtreet in the village of Bonita, Parish of Moorehouse, when her car collide(j with a Union Pacific train. Mrs. Long was ]QUec[ jn the collision. According to eyewitness testimony, Mrs. Long proceeded through the stop sign without yielding.

Plaintiffs’ Petiti n am i s e i ion

As a result of Mrs. Long’s death, her husband, their minor son and daughter | ¡^hereinafter referred to as “plaintiffs”), filed wrongful death and survival actions against the DOTD.[1] Plaintiffs alleged that the DOTD was negligent in failing to erect adequate warning devices at the crossing and in failing to adequately mark the crossing. Plaintiffs further alleged that the DOTD breached a duty it assumed two (2) years earlier to signalize the crossing.
In support of the allegation that the DOTD failed to fulfill an obligation to signalize the crossing, plaintiffs incorporated several letters into its petition for damages. The letters were obtained from the Office of Mayor Michael Lytle, the mayor of the Village of Bonita. The correspondence between Mayor Lytle and the DOTD consisted of three (3) letters which were reproduced in their entirety at paragraphs 9-11 of plaintiffs’ petition for damages.
The first letter, dated May 18, 1995 from Mayor Lytle to DOTD (“Letter 1”), advised the DOTD that there had been two *90 (2) accidents at the crossing at issue in the last eight (8) years, one with a fatality. The mayor stated that he “believefd] that some additional warning is needed at this crossing and am requesting an on-site review of the situation by your office.”
The second letter, dated September 6, 1995 (“Letter 2”), is a response from Merlin Pistorius, Chief of DOTD’s Maintenance Division stating that the DOTD “plans to signalize the railroad crossing from funds available through a federal safety program.” He further advised the mayor that “in order to comply with Federal Highway Administration requirements, the local governing body [in this case, the 13ViIlage of Bonita] must agree by letter or resolution to maintain both pavement striping and signs.”[2] The letter concluded with the DOTD’s request that the mayor provide a written statement agreeing to make the proper markings before “the Department will proceed with the necessary steps to obtain approval from FHWA to complete the project.”
Mayor Lytle responded on September 13, 1995 (“Letter 3”), agreeing to the terms of the correspondence of September 6,1995.

DOTD’s response to Plaintiffs’ Petition for Damages

In response to Plaintiffs’ petition, the DOTD filed an exception of no cause of action and a motion to strike portions of plaintiffs’ petition from the record. Specifically, in response to paragraphs 9-11 of plaintiffs’ petition, which contained verbatim the correspondence between the DOTD and the Village of Bonita, the DOTD argued that the letters contained information inadmissible under 23 U.S.C. § 409.
In addition, the DOTD filed a motion for summary judgment, arguing that the DOTD was not liable for injuries occurring at the Harp Street crossing. Furthermore, the DOTD argued that the Harp Street crossing is not a part of the state highway system and that it is precluded from performing maintenance on “off-system” [3] roadways pursuant to La. R.S. 48:757.[4] In support of these positions, the DOTD | ¿submitted affidavits from Steven Cumbaa, the DOTD’s Construction Services Engineer. Mr. Cumbaa averred that the Harp Street crossing was not part of the state highway system and is neither owned nor under the care, custody or control of the DOTD. Also attached to the motion for summary judgment was an affidavit of William Shrewsberry, the DOTD’s administrator of the Federal Railroad Safety Program. Mr. Shrewsberry attested that the only reason the DOTD “would [have] compiled information about the crossing was to comply with the FRSP as set forth under 23 U.S.C. § 130,” and that the information was protected from discovery or admission into evidence pursuant to 23 U.S.C. § 409. Finally, the DOTD maintained that it could not “be held liable for plaintiffs [sic] injuries because of its *91 participation in the Federal Railroad Safety Program,” citing to this court’s decision in Reichert v. State, Dept. of Trans. and Dev., 96-1419, p. 7 (La.5/20/97), 694 So.2d 193, 199.

Action on the DOTD’s Motion for Summary Judgment

After a hearing on the various motions, the trial court granted the DOTD’s motion to strike together with the motion for summary judgment. Consequently, the DOTD’s exception of no cause of action was rendered moot. Plaintiffs appealed the trial court’s decision. The Court of Appeal, Second Circuit, reversed the trial court’s ruling which struck Letters 2 and 3, from the petition.[5] The appellate court also reversed the trial court’s granting of summary judgment in favor of the DOTD.[6] This court denied a writ on the summary judgment issue, and the United States Supreme Court denied certiorari.[7]
| r,Trial Proceedings
Since summary judgment was denied, the DOTD filed an answer to the petition on July 16, 2002, denying its allegations. Again, the DOTD specifically denied paragraphs 9-11, stating that the information presented by the plaintiffs in its allegations is protected and inadmissible pursuant to 23 U.S.C. § 409.[8]
The case proceeded to a trial by jury. The jury found the DOTD, Mrs. Long, Village of Bonita and Union Pacific Railroad at fault. The jury allocated fault as follows: the DOTD — 60%; Betty Long— 20%; the Village of Bonita — 10% and Union Pacific Railroad — 10%. After the verdict was rendered, the trial judge entered judgment in favor of plaintiffs and against the DOTD. The trial judge revised the jury’s award to conform with the statutory damages cap of $500,000 and the 40% comparative fault assessment. The trial court awarded damages in the following amounts: $131,578.75 for Mrs. Long’s pain and suffering before death; $232,952 for Mrs. Long’s lost wages; and $210,523.75 to James Long and $78,948.75 to each of the Longs’ children for Mrs. Longs’ wrongful death.
The DOTD appealed the verdict to the Court of Appeal, Second Circuit, which affirmed the judgment.[9] This Court granted the DOTD’s writ application to review | fithe propriety of the lower court’s *92 rulings.[10]
HISTORY OF FEDERAL LAWS AND REGULATIONS
Before addressing the merits of the case, it is necessary to provide a historical narrative of several of the federal programs and statutes, all of which will provide a foundation for our analysis of the issues raised by the parties. The relevant statutes and programs consist of the Federal Highway Safety Act of 1966 (“Highway Safety Act”)[11]; the Federal Railroad Safety Act (“Railroad Safety Act”); the Highway Safety Improvement Program (“Program”); and 23 U.S.C. § 409.

History of Federal Railroad Safety Act and Federal Highway Safety Improvement Program

In the 1830’s, the first common-carrier railroad began operation in North America. Later that century, automobiles were introduced and began to be widely used by Americans. With both railroads and automobiles sharing roadways, America began experiencing an increased amount of accidents.[12] Initially, railroads and drivers of automobiles bore a joint responsibility to maintain safety at crossings. Automobile drivers crossing a railroad track had the duty to “stop, look and listen” for approaching trains while the railroad was required to give a reasonable and timeíy warning. Cont’l. Improv. Co. v. Stead, 95 U.S. 161, 164, 5 Ott. 161, 24 L.Ed. 403 (1877).
One of the first cases to discuss the issue of railroad liability for train/ automobile accidents was Nashville C. & S.L. Ry. v. Walters, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949 (1935). In that case, the Supreme Court recognized that trains 17were no longer the main cause of railroad crossing accidents, and noted that the railroads should not bear the sole responsibility for the increase in accident crossings. Nashville C. & S.L. Ry., 294 U.S. at 411, 55 S.Ct. 486. While various remedies to the problem of railroad safety was attempted by both individual states and the federal government; fatalities continued to rise. Due in large part to a need for uniformity and safety, in 1966, Congress enacted the Highway Safety Act.
Beginning with the Highway Safety Act, Congress sought to improve the safety of our Nation’s highways by encouraging closer federal and state cooperation with respect to road improvement projects involving railroad crossings. To that end, Congress has adopted several programs to assist the States in identifying highways in need of improvements.[13]
In 1970, Congress enacted the Railroad Safety Act, which granted comprehensive authority to the U.S. Department of Transportation (“Department”) to oversee all rail carriers’ safety practices and equipment. The Railroad Safety Act further granted the Secretary of the Department the authority to distribute funds to states for public crossings to improve safety and to enhance warning devices. Specifically, 23 U.S.C. § 130 makes federal funding available to states for use in improving. railroad crossings. In addition, the Railroad Safety Act also contained a preemption clause which prohibited states *93 from adopting laws which conflicted with federal laws or regulations. See 45 U.S.C. § 434 (1988). However, states are not precluded from enacting laws which are more stringent. Id.[14] The Railroad Safety Act required the Secretary of the Department to analyze the troubles encountered at roadway/railroad crossings and compile a report detailing possible solutions to the Isproblems. 45 U.S.C. § 433 (1988).
Thereafter, in 1973, Congress amended the Highway Safety Act, mandating that states develop a program for improving the safety of roadway/railroad crossings based on federal requirements and to report annually to the Secretary. 23 U.S.C. § 402. To facilitate the requirements of the amended Highway Safety Act, the Program was enacted giving states guidelines for railroad crossing improvements. The Program sets forth specific policies for the development and implementation of a comprehensive highway safety improvement program in each state. 23 C.F.R. § 924.1. Under the Program, states are required to “conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose.” 23 U.S.C. § 130(d). States must specifically evaluate sites and compile records of accidents, cost of and safety benefits of proposed improvements. The states are further required to incorporate the findings resulting from the evaluation into basic source data which will be used in the planning process outlined in the Program. See 23 C.F.R. 924.13(a)-(b). The Program requires the states to rank the sites in need of approval on a priority basis and the state must determine the type of safety device to be installed. 23 C.F.R. § 924.9 and 23 C.F.R. § 924.13. If the state uses federal funding for the proposed safety device, the state must submit an application to the Federal Highway Administration and obtain approval for funds. 23 C.F.R. § 924.11.
Pursuant to these federal directives, the State of Louisiana surveys all roadway/railroad crossings. The DOTD categorizes the crossings as on-system and off-system crossings. An off-system roadway/railroad crossing is defined by the DOTD as a crossing maintained by a local municipality such as a city or parish. An 1 pon-system roadway/railroad crossing is one owned and maintained by the state. When Louisiana’s participation in the Program began, the DOTD surveyed only “on-system” crossings, i.e. railroad crossings that intersected state highways.[15] After the enactment of the Federal Transportation Assistance Act of 1982, the DOTD also began upgrading “off-system” crossings.[16]
In surveying the off-system crossings, the DOTD evaluates each crossing utilizing the framework set forth in 23 U.S.C. § 130, which includes a host of factors including roadway conditions, accident history, geometry, train speed, type of warning devices in place, and traffic volume. While there are over “3,000 public crossings in Louisiana eligible for evaluation, the DOTD’s ability to dedicate federal funds for upgrades has been limited to maybe twenty crossings each year.”[17]
When the DOTD is evaluating potential crossings, a substantial amount of eommu- *94 nieation with the local entities is both required and expected.[18] The DOTD conducts a diagnostic review of the crossing and makes an evaluation. Since the railroad is integral to the process, input from railroads is often secured. Such input includes plans and estimates for the warning devices or changes. For off-system crossings, the DOTD is required to contact the local entity for confirmation that the crossing is a public crossing and that the crossing will be maintained by the local entity. The local entity’s acceptance of the maintenance responsibility must be obtained under federal regulations and must be included in the DOTD’s submission of its application for funds to the Federal Highway Administration.

_|¿¡¡History of 23 U.S.C. § 409

Facilitating the Program was an arduous task. The Secretary of the Department informed Congress in 1976 that he was having great difficulty receiving data from the states.[19] The Secretary advised Congress that some “states are very concerned” and “expressed strong objection” to the absence of any confidentiality for their compliance efforts “because of legal actions resulting from accidents at these locations before an improvement can be made.”[20] States refused to comply with the information gathering and resisted applying the process “uniformly ... to all public roads,” not using “current, reliable accident data ... to help identify hazardous locations” or performing “adequate evaluations.”[21] In nineteen states, accident location tracking simply did “not cover all highways.”[22] According to the Secretary, states’ “highway departments were reluctant to compile information to identify and prioritize roadway hazards for fear that acknowledging the existence of hazardous conditions would expose them to liability.”[23]
In 1983, the Secretary recommended legislation to Congress “to prevent the unauthorized disclosure of information that States compile in good faith to meet the purposes of Federal aid highway programs to eliminate or reduce hazardous roadway conditions.”[24] The proposed privilege was intended “to encourage greater accuracy and completeness” in complying with the 1973 Highway Safety Act, and to prevent In such compliance “from being used in any judicial proceeding, thereby improving their quality as a basis for programming.” [25]
In 1984, Congress added Section (k) to 23 U.S.C. § 402, which conditioned a state’s eligibility for highway safety funds under that statute on whether the state either “certifies to the Secretary that it has in operation a computerized traffic safety record keeping system” or “provides ... a plan ... for establishing and maintaining a computerized traffic safety *95 record keeping system.” Section (k) further provided:
Notwithstanding any other provision of law, if a report, list, schedule, or survey is prepared by or for a State or political subdivision thereof under this subsection, such report, list, schedule, or survey shall not be admitted as evidence or used in any suit or action for damages arising out of any matter mentioned in such report, list, schedule, or survey.
However, since § 402 only protected raw data such as a “report, list, schedule, or survey ... prepared by a state,” Congress enacted 23 U.S.C. § 409 in 1987. See 23 U.S.C. § 409 (1987). Section 409 extended the same protection of former § 402 to all “reports, surveys, schedules, lists, or data compiled ... for the purpose of ... Sections 130, 144 and 152 of this title ‘as well as to’ any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds.” Id. (emphasis added).
In 1995, Congress amended § 409 to include the words “or collected” after “compiled,” as follows:
Notwithstanding any other provision of law, reports, surveys, schedules, lists or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144 and 152 of the title or for the purpose of developing any highway safety construction improvement project which may be implemented using Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in |1!?such reports, surveys, schedules, lists or data. (As amended Nov. 28, 1995, P.L. 104-59, Title III, § 323, 109 Stat. 591).
This clarification was added in response to inconsistent application of § 409. in state court decisions that, in the view of Congress, misinterpreted the term “data compiled” to apply only to raw data itself and which failed to look at the purpose for which the data was compiled.[26]
Congress’ intent in adopting the 1995 amendment to § 409 was articulated as follows:
It is intended that raw data compiled prior to being made part of any formal or bound report shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any oc *96 currence at a location mentioned or addressed in such data.[27]
Thus, Congress made clear that § 409 restricts the admissibility of information compiled for purposes of the Programs set forth in 23 U.S.C. §§§ 130, 144 and 152, which could be used against states in civil litigation.
Armed with the history of the federal legislation which impacts this matter, we now turn to the arguments raised in the case sub judice.
| iaLAW AND DISCUSSION
The DOTD sets forth three (3) assignments of error. In the first assignment of error, the DOTD asserts that Letters 2 and 3 reflecting correspondence between its office and the mayor are inadmissible under 23 U.S.C. § 409.[28] In the second assignment of error, the DOTD argues that it is not responsible for the condition of the railroad crossing at issue and that plaintiffs failed to produce any evidence regarding the DOTD’s duty to maintain or upgrade the railroad crossing or breach thereof. Finally, the DOTD submits that the jury erred in assigning the majority of fault to the DOTD for plaintiffs’ damages.

Admissibility of Letters Under 23 U.S.C. § 409

The DOTD argues that the letters between its office and the mayor of Bonita are inadmissible pursuant to 23 U.S.C. § 409. This court has previously addressed the applicable scope of § 409 and its amendments.
In Reichert v. State, Dept. of Transp. and Dev., 96-1419 (La.5/20/97), 694 So.2d 193, this Court considered the admissibility of certain exhibits, alleged privileged under § 409, in light of Congress’ 1995 amendment to the statute. In Reichert, plaintiffs sought to introduce several exhibits which plaintiffs maintained showed actual or constructive knowledge on the part of the DOTD of a hazardous condition at the accident site. The trial court allowed the exhibits into evidence over the DOTD’s objection. This court reversed, concluding that § 409 bars discovery and introduction of all information compiled by the state for the purpose of obtaining federal funds to enforce safety at roadway/railroad crossings.
The Reichert exhibits, as in the instant case, consisted in part, of letters 114between the DOTD and a municipality. The court reviewed each of the specific documents, explaining:
Exhibit 29 contains a letter dated May 14, 1992, from DOTD’s chief engineer to a state representative, and discusses a traffic safety study at the intersection where the instant accident occurred. This exhibit included an attached report compiled from the study, which includes a recommendation and proposed budget for the installation of a flashing beacon. Exhibit 33 contains a letter dated March 21, 1985, from DOTD’s chief engineer responding to the request for a flashing beacon at the same intersection. This exhibit includes a report discussing the results of a traffic volume study and concluding that the volume at that intersection did not dictate a need for a flashing beacon. Moreover, this report states that a review of DOTD’s accident files revealed no abnormal or unusual *97 conditions at the intersection. Exhibit 36 contains a letter dated March 2, 1988, from DOTD which states that additional reports based on traffic volume studies and surveys failed to demonstrate a need for the installation of traffic control devices at that intersection. Finally, Exhibit 37, a letter dated February 24, 1988, from DOTD, recommends against a flashing beacon based on the results from a spot speed study, a traffic volume study, a sight distance study and a review of the accident record for the one-year evaluation period.
Reichert, 96-1419 p. 5, 694 So.2d at 198. Although two of the letters in Reichert had reports attached to them, the other two letters had no exhibits and merely discussed information regarding upgrading the roadway/railroad crossing at issue.
In light of the amendment to § 409, the court concluded that the exhibits were erroneously admitted “as each of them reflects information collected and compiled by the DOTD in furtherance of potential highway safety projects that may have been supported by federal funds.” Reic-hert, 06-1419 p. 5, 694 So.2d at 198. Thus, because the exhibits reflected information gathered for purposes of a highway safety program, this court held the documents were inadmissible under § 409.
In Palacios v. Delta R.R. Inc., 98-2932 (La.7/2/99), 740 So.2d 95, we recognized the principle that the § 409 privilege is intended to encourage states to actively and thoroughly investigate railroad crossing safety, free from the fear that information compiled to serve this purpose might be later used to establish tort [ pliability. In Palacios, plaintiffs’ interrogatories, requests for admissions, and requests for production of documents questioned the DOTD about its records and files concerning the crossing. The discovery sought studies, inspections, accident histories or complaints involving the intersection. The DOTD opposed the discovery of the evidence under § 409, contending that the state’s information on the intersection, as well as every railroad crossing in the state, is collected in order to comply with federal law concerning federal highway and railroad safety. In analyzing whether the documents were privileged, this court extracted certain pertinent language from § 409 to create a framework for courts to apply in determining whether documents should be afforded § 409 protection. The Court held that the protection of § 409 will apply to:
(1) reports, surveys, schedules, lists or data
(2) compiled or collected,
(3) for the purpose of identifying, evaluating, or planning the safety enhancement of ... railway-highway crossings,
(4) pursuant to 23 U.S,C. § 130.
Palacios, 98-2932 p. 8, 740 So.2d at 99.
After reviewing the discovery request in Palacios together with the congressional intent of § 409, a unanimous court found that the information sought was “assembled as part of a federal railway safety program intended to aid the state and federal governments in identifying, evaluating and planning its railroad crossing safety enhancement needs, as mandated by 23 U.S.C. § 130(d), so as to trigger the application of 23 U.S.C. § 409.”[29] Palac-ios, 98-2932 p. 12, 740 So.2d at 101. The court further stated that “such a result is consistent with the purpose of Section 409, which is to encourage states to actively and thoroughly investigate the railroad crossings within their borders, free from the fear that data compiled to serve this *98 |1fipurpose might be later used to establish tort liability.” Id.
This Court recognized the potential that its holding in Palacios would be perceived as a bright line rule that all information in the state’s possession was inadmissible and cautioned:
Of course, this is not to say that all documents and information in the state’s possession will always be privileged under section 409. We conclude only that records amassed pursuant to the federal safety evaluation programs described in 23 U.S.C. Sections 130,144 or 152, or for the purpose of developing other highway safety improvement projects which may be federally funded, are protected.
Palacios, 98-2932 p. 12-13, 740 So.2d at 101.
Thus, this Court has instructed courts not to rule on the admissibility of documents in a vacuum, but rather to examine the documents to determine whether the information was amassed pursuant to the federal highway safety evaluation programs.
Several years after our decision in Pa-lacios, the United States Supreme Court granted certiorari in Pierce County v. Guillen, 537 U.S. 129, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003) (“Guillen ”). In Guil-len, the Supreme Court was asked to decide whether the 1995 amendment to 23 U.S.C. § 409 was a valid exercise of Congress’ authority under the United States Constitution.
Ignacio Guillen had been killed in an automobile accident as he crossed a highway/railroad intersection in Pierce County, Washington. Prior to the accident, the State of Washington requested funding for improvements to the intersection under the federal highway improvement program set forth in 43 U.S.C. § 152. The State of Washington’s application for funding was originally denied by the highway administration. Thereafter, the state reapplied and the second application was approved three weeks after Mr. Guillen’s accident.
Through discovery requests, the plaintiffs requested information from the state 117regarding accidents which had occurred at the intersection where Mr. Guillen died.[30] The state objected, claiming that any relevant documents were protected by § 409. Nonetheless, the trial court ordered production of the documents.[31] The intermediate appellate court affirmed the trial court’s decision and the matter was appealed to the Washington Supreme Court.
The Washington Supreme Court examined the scope of § 409 and distinguished between those documents in the custody of the Public Works Department and documents held by other agencies such as the county sheriff. The court reasoned that the statute did not hinge “on the identity of the custodian of the document at issue,” but rather whether the documents were collected for purposes related to § 152. Guillen, 537 U.S. at 139, 123 S.Ct. 720. Nonetheless, the Washington Supreme Court concluded that the 1995 amendment to § 409 protected only information originally created solely for § 152 purposes.[32]
*99 A unanimous Supreme Court reversed the Washington Supreme Court. The Supreme Court adopted the interpretation of the scope of § 409 proposed by the inter-vener, the United States Government, that “the 1995 amendment to § 409 protects not just information an agency generates, i.e. compiles, for § 152 purposes, but also any information that an agency collects from other sources for §152 purposes.”[33] [emphasis added] The Supreme Court considered the purpose behind 1 ^Congress’ adoption of § 409 and stated:
Congress adopted § 152 to assist state and local governments in reducing hazardous conditions in the Nation’s channels of commerce. That effort was impeded, however, by the States’ reluctance to comply fully with the requirements of § 152, as such compliance would make state and local governments easier targets for negligence actions by providing would-be plaintiffs a centralized location from which they could obtain much of the evidence necessary for such actions. In view of these circumstances, Congress could reasonably believe that adopting a measure eliminating an unforeseen side effect of the information-gathering requirement of § 152 would result in more diligent efforts to collect the relevant information, more candid discussions of hazardous locations, better informed decision making, and, ultimately, greater safety on our Nation’s roads. Consequently, both the original § 409 and the 1995 amendment can be viewed as legislation aimed at improving safety in the channels of commerce and increasing protection for the instrumentalities of interstate commerce. Guillen, 537 U.S. at 148, 123 S.Ct. 720.
Thus, Guillen established that information compiled and used for purposes related to § 152, even if created by and in the hands of another agency, are protected by § 409.
We find the reasoning of Guillen and our language in Reichert and Palacios particularly instructive to our inquiry in this ease, and therefore consider that instruction in our analysis of the letters introduced by the plaintiffs. In particular, we must keep in mind Congress’ goal in enacting § 409, i.e. fostering candor and diligence in information gathering. States must be allowed to compile information without hesitation and fear that information collected may be used against them in private litigation.
Letter 1, written by the mayor, advises the DOTD that there had been two (2) accidents at the crossing in the last eight (8) years. Letter 2 advises the may- or that the DOTD planned to signalize the railroad crossing from funds available through a federal safety program and requested a commitment from the mayor as to whether the municipality would agree to maintain both pavement striping and signs. Letter 3 is 119the mayor’s response, agreeing to the terms set forth in Letter 2. The letters evidence the commencement of the process in selecting the roadway/railway crossing for improvement and can be compared to the letter in Guillen which was originally prepared and maintained by the county sheriff. In fact, the letters herein bear a strong resemblance to the letters held inadmissible in Reichert.
*100 In the ease sub judice, two of the three letters were originally prepared by the mayor and maintained by his office. In addition, the DOTD’s response, while prepared by the DOTD, was likewise maintained by the mayor’s office. The fact that two of the letters were not specifically created by the DOTD does not render the letters admissible. Rather, as required by Guillen, we must examine the letters for their content and purpose.
In Letter 1, the mayor stated that he was advised that the DOTD was “in charge of determining whether warning lights or gates are needed at grade crossings ... and requested] an on-site review of the situation by your office.” The letter suggests that the mayor was referring to the evaluation process undertaken by the state as required by the federal government. Thus, the initial letter can be construed as a request by the mayor that the process of obtaining federal assistance for a railroad upgrade pursuant to § 130 be initiated.
This conclusion is further supported by the DOTD’s reply, Letter 2, which states:
the Department plans to signalize the railroad crossing from funds available through a federal safety program. In order to comply with Federal Highway Administration requirements....
The language of Letter 2 reveals that the DOTD intended to utilize funds pursuant to a federal safety program; however, the mayor had to agree to provide the local commitment required by the federal safety program. The mayor agreed that the local ¡^government would provide pavement markings and signs as required, and his commitment to do so is contained in Letter 3.
Hence, we find these three letters represent information necessary for the commencement of the upgrade for this roadway/railroad crossing, and thus, the letters effectuate the purpose of the federal safety program. Taken as a whole, and in the context of the framework of the purpose of § 409, we find the letters were compiled and collected by the DOTD for purposes related to funding through § 130, a federal safety program. Thus, we find the letters are protected from discovery and are inadmissible under 23 U.S.C. § 409.
However, we caution, as we did in Palacios, that all letters in the file of the DOTD are not protected by virtue of being in its possession. Rather the purpose of the document, no matter in whose possession, must relate to purposes as defined in 23 U.S.C. §§§ 130, 144 or 152. Guillen, 537 U.S. at 146, 123 S.Ct. 720. The privilege afforded to state agencies in § 409 and the documents at issue must not be viewed in a vacuum; rather, inquiry should be directed toward the purpose for which the documents are created.
Accordingly, we reverse the ruling of the lower courts, finding the trial court erred in admitting Letters 2 and 3 into evidence. As previously stated, the appellate court previously found Letter 1 to be inadmissible and the contents of Letter 1 were stricken from the plaintiffs’ petition. On remand, all of the letters as reproduced in plaintiffs’ petition are likewise to be removed.

DUTY OF THE DOTD

Plaintiffs seek recovery from the DOTD under the theory of negligence based on La. Civ.Code art. 2315. Conversely, the DOTD maintains that it bears no responsibility for the condition of the roadway/railroad crossing and that plaintiffs | ¡^failed to produce any evidence regarding a duty to maintain the crossing or the breach thereof. Thus, the DOTD submits that plaintiffs failed to satisfy several critical elements of a negligence claim.
*101 In order to determine whether a plaintiff should prevail on a claim in negligence, Louisiana courts employ a duty-risk analysis. Perkins v. Entergy Corp., 00-1372, (La.3/23/01), 782 So.2d 606. A duty-risk analysis involves five elements which must be proved by the plaintiff: (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant’s conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) proof that the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element). Bonin v. Ferrellgas Inc., 2003-3024 p. 5 (La.7/2/04), 877 So.2d 89, 94; Perkins v. Entergy Corp, 00-1372 p. 7, 782 So.2d at 611; and Boykin v. La. Transit Co., Inc., 96-1932, pp. 8-9 (La.3/4/98), 707 So.2d 1225, 1230.
A proper duty-risk analysis involves identifying (1) the duty imposed upon the defendant by statute or rule of law and (2) the conduct by defendant that allegedly constituted a breach of that duty. Boykin, 96-1932 p. 9, 707 So.2d at 1230. In the case sub judice, plaintiffs contend that the DOTD assumed a duty based on Rick v. State, Dept. of Trans0 and Dev., 93-1776 (1/14/94), 630 So.2d 1271. Plaintiffs submit that the DOTD breached their duty by (1) failing to take affirmative steps to erect lights and mechanical devices which would have prevented this accident from occurring; (2) failing to signalize the crossing, thus failing to fulfill an obligation it undertook two years prior to the accident; and (3) failing to recognize or correct | ggdefects with the intersection which included improper marking and inadequate marking.
Since plaintiffs assert that DOTD assumed a duty pursuant to Rick, the facts of that case are instructive. Mrs. Rick was killed when a train struck her vehicle after the vehicle stalled on a railroad track at a crossing in Hammond, Louisiana. The Court’s analysis included a history of the DOTD’s investigation of the crossing, which revealed that a letter was written by the mayor of Hammond to the DOTD requesting active warning devices for three dangerous crossings, including the Rick crossing. Id., 93-1776 p. 2-3, 630 So.2d at 1273-1274. The DOTD evaluated the crossing using an indexing system. Id. Because the DOTD erroneously used an outdated traffic inventory, which showed the average daily traffic count to be much lower than the actual traffic count, an erroneous hazard index rating was computed by the DOTD for the crossing. Id. Despite the low hazard index, the DOTD nonetheless selected the crossing for upgrade twenty-two months before Mrs. Rick’s fatal accident. Id.
The Rick court noted that the DOTD erroneously calculated the hazard index of the crossing and stated “had it used the proper formula, the crossing would have been a greater priority for upgrade.” Id., 93-1776 p. 4, 630 So.2d at 1274. Then, without further analysis, the court concluded:
Here, it is unnecessary to decide whether the DOTD had an affirmative duty because the DOTD assumed a duty to upgrade this crossing by selecting it for improvement on September 10, 1986. Once a duty is assumed, negligent breach of that duty may create liability. Harris v. Pizza Hut of La., Inc., 455 So.2d 1364 (La.1984).
Rick, 93-1776 p. 7, 630 So.2d at 1275. Thus in Rick, this court held that the *102 DOTD assumed a duty of an off-system railroad crossing by virtue of its selection of the crossing for improvement. Id. Moreover, because the Rick court did not separately J^address the issue of the breach of that duty, it effectively merged these two concepts of the duty-risk analysis. This was erroneously done. See Boy-kin, 96-1932 p. 9, 707 So.2d at 1230 (“Many cases presenting a duty-risk analysis do not adequately distinguish the duty element and the breach of duty element.”).
Chief Justice Calogero and Justice Marcus dissented from the majority opinion in Rick. The Chief Justice issued written reasons in dissent, stating:
I do not agree that the Department of Transportation and Development assumed a duty to upgrade the off-system railroad crossing where the fatal accident occurred, which, according to the majority, made it unnecessary to consider whether an affirmative duty existed. In merely selecting for upgrading this railroad crossing, which did not involve roads or highways owned and maintained by the State of Louisiana, the DOTD did not assume a duty to assure that the Illinois Central Railroad Company, the owner of the site, would install active warning devices before injury occurred. The selection of the railroad crossing for upgrading was only the first step in an involved process to access federal funding for upgrade projects. That step in no way provided the victim or any other commuter with an increased impression of security from the known hazard. Furthermore, I do not believe that the allocation of federal funding to the state to make railroad grade crossing improvements at approximately 35 of a possible 4000 crossings yearly imposes on the state a duty to provide protective devices at railroad crossings for off-system roads.
Rick, 93-1776 p. 1 [dissent], 630 So.2d at 1278.
After Rick, this Court’s analysis of the DOTD’s assumption of the duty to maintain a roadway/railroad crossing became further muddled in Archon v. Union Pac. R.R., 94-2728, 94-2743 (La.7/2/96), 675 So.2d 1055. In Archon, a fatal injury occurred at an off-system crossing on a parish road in 1989. The DOTD selected the crossing for improvement and had even accepted federal money to do so in the early 1980s. The Court initially found the DOTD hable for the accident not only because the DOTD selected the crossing for improvement, but also on the basis of contractual agreements DOTD made with the railroad in 1964 and 1976 wherein the DOTD agreed to provide warning devices at the crossing at issue. Because the Court found [24DOTD had contractually assumed a duty to provide warning devices, the Court pretermitted arguments that the DOTD assumed a duty merely because it accepted federal funds to up-grade the off-system crossing or because of the DOTD’s eventual selection of the crossing for an upgrade. Archon v. Union Pacific R.R., 94-2728, 94-2743 p. 8, 657 So.2d 987, 992.
On rehearing, Archon v. Union Pacific Railroad, 94-2728, 94-2743 (La.7/2/96), 675 So.2d 1055, the Court emphasized the DOTD’s negligence in 1983 in failing to follow through on its own recommendation for an upgrade to active warning devices. The active warning devices were not installed until after the fatal accident in 1989. Relying solely on Rick, the opinion on rehearing reaffirmed the Rick holding which found an assumed duty on the part of the DOTD merely for selecting the crossing for upgrade.[34]
*103 Our decisions in Rick and Archon (on rehearing) have been interpreted to create an assumed duty, and breach of that duty, on the part of the DOTD by merely selecting a crossing for upgrade.[35] This interpretation is erroneous. We clearly state today our holding that the mere selection of an off-system crossing by the DOTD, without any further showing, does not impose an automatic duty on the DOTD to be responsible for the condition of the railroad crossing. Our previous holding to the contrary in Rick, which was subsequently relied on in the rehearing of Archon, is expressly overruled.
So finding, we now turn to the analysis of the DOTD’s duty in the case sub | j>i-judice. The threshold issue of a negligence claim starts with the first element— duty. See Meany v. Meany, 94-0251 p. 6 (La.7/5/94), 639 So.2d 229, 233. It is undisputed that the Harp Street Crossing is owned by the Village of Bonita, and not the DOTD. In fact, plaintiffs’ petition only alleges that the DOTD was obliged to maintain the Harp Street crossing — ownership was never alleged. Plaintiffs asserted that the DOTD assumed a duty to upgrade the crossing and produced the letters between the DOTD and mayor as evidence of that duty. However, as we have also held today, the letters themselves are inadmissible pursuant to 23 U.S.C. § 409.
A thorough review of the record reveals plaintiffs relied solely on the letters between the mayor and the DOTD regarding selection of the crossing for upgrade to establish a duty. This reliance was based upon our previous decisions in Rick and Archon, which we have expressly overruled in this opinion. Thus, since plaintiffs have failed to establish the primary element of a negligence cause of action, namely duty, we find plaintiffs failed to establish the DOTD’s negligence. However, since the plaintiffs did not have the benefit of the analysis set forth in the present opinion, we hereby remand the case to the trial court for a new trial consistent with our decision.[36]
CONCLUSION
For the reasons set forth herein, we reverse the rulings of the lower courts which found the correspondence between the DOTD and mayor of the Village of Bonita admissible. The history of the various federal highway and railroad safety programs, the amendments to 23 U.S.C. § 409, the Supreme Court’s decision in Guillen, and our prior decisions, indicate that documents compiled by states for the | ^purpose of programs relating to § 130 are protected from admission in civil litigation against the state.
In addition, we overrule our previous decisions in Rick v. State, Dept. of Transp. & Dev., 93-1776 (La.1/14/94), 630 So.2d 1271 and Archon v. Union Pacific R.R., 94-2728, 94-2743 (La.7/2/96), 675 So.2d 1055 (on rehearing), to the extent the decisions assume a duty on the part of the DOTD, and a breach of that duty, to maintain off-system railroad crossings merely *104 by selecting an off-system crossing for upgrade. Accordingly, we reverse the jury’s determination finding the DOTD liable, in part, for plaintiffs’ injuries. Normally we would remand this matter to the court of appeal for a de novo review of the record. Gonzales v. Xerox, 320 So.2d 163 (1975). However, based on our review of the record and our decision here to overrule Rick and Archon, we find the case distinguishable from Gonzales. Without a new trial, plaintiffs would be penalized for relying on jurisprudence this Court has only now overruled.
DECREE
JUDGMENT REVERSED, CASE REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
JOHNSON, J., dissents and assigns reasons.

. At paragraph 3 of plaintiffs' petition for damages, plaintiffs stated that James Long and Christopher Long have settled their claims with Union Pacific Railroad Company. The DOTD was the only defendant named in the petition for damages. The original petition for damages, as well as other early pleadings, are contained in a record reviewed by the appellate court on a motion for summary judgment under No. 32,124. The transcript of the trial, as well as pleadings filed after the adjudication of the motion for summary judgment, are contained in a different appellate record, No. 37,422. In order to thoroughly review this case, it was necessary for us to review both separately numbered appellate records.

. Attached to Letter 2 were excerpts from the Manual of Uniform Traffic Control Devices instructing the mayor of the proper markings which had to be maintained by the municipality-

. An off-system crossing is defined by the DOTD as a crossing maintained by a local municipality such as a city or parish. An on-system crossing is defined as one owned and maintained by the state.

.La. R.S. 48:757 provides, in pertinent part:
"The Department of Transportation and Development shall perform no work on the parish road system or on any other roads or streets which are not in the state highway system, whether such work is construction or maintenance and whether the work is do.ne at the expense of the state or at the expense of the governing authority of the parishes...."

. The court of appeal apparently left intact the trial court determination that Letter 1 was inadmissible and should have been stricken from the petition.

. Long v. State, Dept. of Trans. and Dev., 32,-124 (La.App. 2 Cir. 8/18/99), 743 So.2d 743.

. Long v. State, Dept. of Trans. and Dev., 99-2956 (La.12/17/99), 751 So.2d 885, cert. denied, 529 U.S. 1110, 120 S.Ct. 1964, 146 L.Ed.2d 796 (2000).
During oral argument and throughout trial, plaintiffs assert that the “law of the case" doctrine precludes the DOTD and this Court from re-examining the issue of the admissibility of the correspondence between the DOTD and Mayor Lytle, since this Court previously denied a writ on the issue. The denial of a writ in this Court has no precedential value and should in no way be construed as an adoption of a court of appeal’s ruling or reasoning. See St. Tammany Manor, Inc. v. Spartan Bldg. Corp., 509 So.2d 424 (La.1987) and Pitre v. La. Tech Univ., 95-1466 (La.5/10/96) 673 So.2d 585. Thus, the issue of admissibility of the letters is properly before this Court.

. Regarding paragraph 9, the DOTD asserted that the information contained in Letter 1 had previously been stricken from the record and that the court of appeal had left that ruling intact. Long v. State, Dept. of Trans. and Dev., 32,124 (La.App. 2 Cir. 8/18/99), 743 So.2d 743, writ denied, 99-2956 (La.12/17/99), 751 So.2d 885.

. Long v. State, Dept. of Trans. and Dev., 37,-422 (La.App. 2 Cir. 11/24/03), 862 So.2d 149.

. Long v. State, Dept. of Transp. and Dev., 04-0485 (La.5/7/04), 872 So.2d 1068.

. And as amended in 1973. See infra.

. Historically, railroads ran directly over highways because the roadways provided the most efficient and direct route from town to town. Fed. Highway Administration, U.S. Dept, of Transportation, Railroad-Highway Grade Crossing Handbook 5 tbl. 5 (1992).

. See Pierce County v. Guillen, 537 U.S. 129, 133, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003).

. Committee on Transportation & Infrastructure, "Jurisdiction and Activities Subcommittee on Railroads,” 109th Cong. Jan. 2005.

. See Rick v. State, Dept. of Trans. and Dev., 93-1776 (La.1/14/94), 630 So.2d 1271.

. See Rick, 630 So.2d at 1274.

. Record, Vol. Ill, p. 568 (Testimony of William Shrewsberry).

. Record, Vol. Ill, p. 569.

. Kara M. Turner, "The Great Train Robbery that Wasn’t: Practical Implications of CSX v. Easterwood,” 72 Wash. U.L.Q. 1449, 1456 (1994), citing Fed. Highway Admin., U.S. Dep't of Transportation, Railroad-Highway Grade Crossing Handbook 5 tbl. 5 (1992).

. United States Department of Transportation and Development, Secretary's Second Annual Report on Highway Safety Improvement Programs (1976).

. United States Department of Transportation and Development, Secretary's Annual Report on Highway Safety Improvement Programs (1986).

. Id.

. Id.

. Id.

. Id.

. This Court's decision in Wiedeman v. Dixie Elec. Membership Corp., 627 So.2d 170 (La.1993), was cited as an example of the misinterpretation of § 409 which the 1995 amendment was supposed to clarify. In Pierce County v. Guillen, 537 U.S. 129, 133, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003), the Supreme Court explained that the proper scope of § 409 engendered a great deal of confusion among circuit and state courts:
Some state courts, for example, concluded that § 409 addressed only the admissibility of relevant documents at trial and did not apply to pretrial discovery. According to these courts, although information compiled for § 152 purposes would be inadmissible at trial, it nevertheless remained subject to discovery.... Other state courts reasoned that § 409 protected only materials actually generated by a governmental agency for § 152 purposes, and documents collected by that agency to prepare its § 152 funding application remained both admissible and discoverable. See e.g. Wiedeman v. Dixie Elec. Membership Corp., 627 So.2d 170, 173 (La.1993).
Guillen, 537 U.S. 129, 135, 123 S.Ct. 720, 154 L.Ed.2d 610 (emphasis added). See also Reichert v. State, Dept. of Transp. and Dev., 96-1419 p. 6 (La.5/20/97), 694 So.2d 193, 198.

. National Highway System Designation Act of 1995, Pub.L. No. 104-246, § 328 reprinted in 1995 U.S.C.C.A.N. (109 Stat.) at 651.

. The record reveals the parties were confused as to whether the lower court’s ruling encompassed the admissibility of Letters 1, 2 and 3 or just Letters 2 and 3. In order to clear any confusion, the admissibility of all three letters is discussed herein.

. Victory, J., not on panel. Supreme Court Rule IV, Part 2 § 3.

. The Guillen plaintiffs requested information which was "in the hands of the sheriff or other law enforcement agencies, not reports or data 'collected or compiled' by the Public Works Department.” Guillen, 537 U.S. at 138, 123 S.Ct. 720. [emphasis in original]

. One of the documents at issue was a draft memorandum from petitioner's public works director to a county council member, consisting of information used for petitioner’s application for § 152 funds for the intersection.

.Rather than determining whether the documents or data at issue in the case would be protected under its reading of § 409, the Washington court vacated the lower court’s judgment and remanded the case so that the *99 lower courts could consider the record. Guil-len, 537 U.S. at 140, 123 S.Ct. 720.

. The Court also accepted the Government’s more restrictive view that § 409 does not apply to information compiled or collected for purposes unrelated to § 152 and held by agencies that are not pursuing § 152 objectives. Guillen, 537 U.S. at 146, 123 S.Ct. 720.

. Justices Marcus, Victory and Kimball dissented from the majority opinion on rehear *103 ing. Justice Lemmon concurred, stating in pertinent part:
The Rick case and the present case are both negligence cases. Although I was not on the Rick panel under the temporary eight-member system of this court's composition, I tend to disagree with the finding of negligence in the Rick decision.

. See Long v. State, Dept. of Trans. and Dev., 37/422 (La.App. 2 Cir. 11/24/03), 862 So.2d 149 and Cambre v. National Railroad Passenger Corporation, et al., 97-473 (La.App. 5th Cir. 12/10/97), 705 So.2d 237.

. Based upon our holding, we pretermit the DOTD's final assignment of error regarding the jury's allocation of fault.