803 So.2d 151 (2001)
Margaret C. FUSELIER
v.
Lorraine MATRANGA, Hartford Insurance Company and the Parish of Jefferson.
No. 01-CA-721.
Court of Appeal of Louisiana, Fifth Circuit.
November 27, 2001.
*152 Allain F. Hardin, Fransen & Hardin, New Orleans, LA, John J. Messina, Kenner, LA, Counsel for Margaret C. Fuselier, Plaintiff-Appellant.
Craig Sweeney, Connick, Wimberly & deLaup, Metairie, LA, Counsel for Jefferson Parish, Defendant-Appellee.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
In this wrongful death suit arising out of the death of a motorcyclist, the trial judge found that the driver of the other vehicle involved in the accident was negligent and Jefferson Parish was not negligent. Damages were awarded to the motorcyclist's mother. The motorcyclist's mother appeals. For the following reasons, we affirm the trial court's ruling.
On July 17, 1996, Trent Gray ("Gray") was fatally injured when the motorcycle he was driving struck the vehicle driven by Lorraine Matranga ("Matranga") on Veterans Memorial Boulevard ("Veterans") at *153 the intersection of Homestead Avenue ("Homestead") in Jefferson Parish. When the accident occurred, Gray was traveling westbound toward Kenner in the far left lane of Veterans. Matranga, who was 76 years old at the time of the accident, after allegedly stopping at the stop sign on Homestead, attempted to cross the westbound lanes of Veterans to make a left turn onto the eastbound lanes of Veterans. Matranga testified that she did not see anyone when she pulled out from Homestead but, before she made it completely across the westbound lanes of Veterans, she felt an impact on the driver's side of her car. Gray was transported from the accident scene to East Jefferson General Hospital. Although he was wearing a helmet at the time of the accident, Gray died as a result of the severe injuries that he received in the accident.
On October 2, 1996, Gray's mother, Margaret Fuselier, filed suit against Matranga, Hartford Insurance Company, and Jefferson Parish. On August 5, 1997, Fuselier's suit was consolidated with a suit filed by Gray's father, Willard Gray. Before trial, Hartford Insurance Company deposited the limit of Matranga's liability policy plus judicial interest into the registry of the Twenty-Fourth Judicial District Court. On November 22, 1999, pursuant to a consent judgment, the proceeds of that policy were distributed to Margaret Fuselier and Willard Gray. As a result, Hartford Insurance Company was not a party to the suit at the time of trial.
The matter was tried before the bench on December 4, 2000. In his extensive written reasons, the trial judge found that Fuselier failed to prove that the intersection was unreasonably dangerous to a prudent driver. Further, the trial judge held that the testimony was undisputed that Matranga failed to properly yield at the intersection and her gross negligence in failing to yield at the intersection was the sole cause of the accident. The trial judge ruled that Jefferson Parish had no fault in this accident and, therefore, bore no liability for the damage that resulted from the accident. The trial judge awarded Fuselier[1] $300,000 for loss of love and affection of her son, $10,000 for Gray's pre-impact fear, and $25,936.55 for medical and funeral expenses.
On December 21, 2000, Fuselier timely filed a Motion for New Trial alleging that the judgment rendered was contrary to the law and evidence since the intersection in question created an unreasonable risk of harm to the public and Matranga was not the sole cause of the accident. After a hearing, the trial judge denied Fuselier's Motion for New Trial. On February 7, 2001, Fuselier timely filed a petition appealing the portion of the judgment dismissing her claim against Jefferson Parish.
In her appellate brief, Fuselier asserts that the trial court erred in holding that the intersection of Veterans and Homestead did not create an unreasonable risk of harm to safely-traveling motorists because there were a number of accidents at that intersection and Jefferson Parish had already recommended changes to the intersection, which had not yet been completed.
Although Fuselier suggests seven issues for review,[2] in essence the sole issue *154 presented for our consideration is whether the trial court erred in holding that Jefferson Parish was not at fault in the accident that caused Gray's death.
Louisiana law provides two theories under which a public entity may be held liable for damages: negligence under La. Civ.Code art. 2315[3] and strict liability under on La. Civ.Code art. 2317.[4] Traditionally, these theories could be distinguished because, under strict liability, a plaintiff was relieved of proving that the owner or custodian of a thing which caused damage knew or should have known of the risk involved. Campbell v. Dept. of Transp. and Dev., 94-1052 (La.1/17/95), 648 So.2d 898, 901. In 1985, however, the Louisiana Legislature enacted La. R.S. 9:2800, which eviscerated this distinction in claims against public entities by requiring proof of actual or constructive notice of the defect which causes damage.[5] Thus, the burden of proof is now the same under either theory.
In a suit against a public entity, the plaintiff must establish that the thing which caused the damage was in the custody of the defendant, that the thing was defective because it had a condition which created an unreasonable risk of harm, that defendant had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and that the defect was a cause in fact of plaintiff's injuries. Bessard v. State, Dept. *155 of Transp. and Dev., 94-0589 (La.11/30/94), 645 So.2d 1134, 1136.
Jefferson Parish is a public entity within the meaning of the statute. La. R.S. 9:2800(e). It is also undisputed that Jefferson Parish had custody of Veterans Memorial Boulevard, Homestead Avenue, and the intersection at which the accident occurred. Moreover, Jefferson Parish had, and still has, a statutory duty to maintain public roads in a safe condition to avoid exposing the public to unreasonable dangers. La. R.S. 48:35.
It is well settled that a governmental authority that undertakes to control traffic at an intersection must exercise a high degree of care for the safety of the motoring public. Briggs v. Hartford Ins. Co., 532 So.2d 1154, 1156 (La.1988). A public entity, however, cannot guarantee the safety of all travelers. Id. Nor can the public entity be held responsible for all injuries resulting from any risk posed by the roadway or its appurtenances, only those caused by an unreasonable risk of harm to others. Lee v. State through Dept. of Trans. and Dev., 97-0350 (La.10/21/97), 701 So.2d 676, 678.
Whether a public entity breached its duty to the motoring public, by knowingly maintaining a defective or unreasonably dangerous roadway, depends on the facts and circumstances of the case. Campbell v. State through Dept. of Trans. and Dev., 648 So.2d at 901-902. Causation is a fact-specific inquiry. Rick v. State, Dept. of Transp. and Development, 93-1776 (La.1/14/94), 630 So.2d 1271, 1275. Great deference is accorded to the trier of fact on the issue of causation. Id.
At trial, Fuselier presented testimony from Douglas Roberts, ("Roberts") who has been Traffic Engineering Supervisor for Jefferson Parish Public Works Department since 1991. He testified that, in 1991, at the request of a Parish Councilman, he conducted a traffic study of Veterans between Elmeer Avenue and Aurora Avenue.
At trial, Roberts estimated that 40,000 cars a day travel that corridor of Veterans and that an average of 90 cars travel on Homestead during that same time frame. He noted that one major problem at the Veterans-Homestead intersection was traffic from a local, discount pharmacy on the corner of Veterans and Homestead, which catered to an elderly population. The pharmacy's parking lot allowed uncontrolled access onto Veterans, which he described as "really hectic."
As an adjunct to his initial study, he also studied the type of accidents that occurred at each intersection. His research showed that, in 1994, there were at least five and possibly six "crossing" accidents at the intersection of Veterans and Homestead similar to the accident in this case. Based on his study, his opinion was that the Parish did not need improvements at the intersection of Veterans and Homestead, except to work out an agreement with the local pharmacy to regulate its traffic more effectively. As an alternative, the Parish could make "geometric improvements" to the intersections at Elmeer, Homestead, and Aurora. Finally, the Parish could continue to evaluate the situation and determine whether signals would be useful at Elmeer and Aurora. However, no improvements were made in 1991.
He admitted that the motorcycle fatality at that intersection in 1996 renewed residents' concerns about the intersection. In fact, Congressman David Vitter became involved. In March of 1997, Jefferson Parish made "geometric improvements" to several intersections in the Elmeer-Aurora corridor, including the intersection at Veterans and Homestead. The "geometric improvement" forced northbound Homestead *156 traffic to turn right onto Veterans (westbound) and make a u-turn at Elmeer Avenue in order to access the eastbound lanes of Veterans. The change prevented the same traffic maneuver that caused the accident that killed Gray.
On cross-examination, Jefferson Parish tendered Roberts as an expert in traffic engineering and accident reconstruction. He reiterated that, in his opinion, even prior to the geometric improvements, the Veterans-Homestead intersection was operating as expected and was not unsafe. He also indicated that putting a "no left turn" sign without geometric improvements had proved, in his experience, to be an ineffective solution at other intersections with a "crossing" problem. He stated that the Manual on Uniform Traffic Control Devices was a useful guideline in developing traffic flow solutions but that the Manual did not contain absolute standards for installing signals or making other improvements.
Roberts also testified that he had reviewed the police report of the accident as well as police photographs of the accident scene. He opined that the accident was caused by the driver (Matranga) either disregarding the stop sign or failing to yield to oncoming traffic before entering Veterans Boulevard from Homestead. He also stated that overall motorcycles are less visible because of their size than other vehicles. Under cross-examination by Matranga, Roberts testified that the improvements made to the Veterans-Homestead intersection decreased "crossing" accidents at that intersection significantly.
At trial, Fuselier also presented testimony from Andrew Ramisch, who was accepted as an expert in traffic engineering. Based on his review of the relevant documents including the police report, accident photographs, and Matranga's deposition and his investigation of the intersection after the geometric changes were made, he opined that the cause of the accident was Matranga's failure to yield at the intersection and defective traffic engineering at the Veterans-Homestead intersection. He also indicated that, according to the Manual on Uniform Traffic Control Devices, the "volume and accident history" of the intersection indicated that traffic signalization was warranted. He also testified that, in his opinion, the Veterans-Homestead intersection constituted an unreasonable risk of harm to motorists that was known to Jefferson Parish and, because of its failure to correct the hazard, was a cause of Trent Gray's accident.
On cross-examination, Ramisch admitted that the Manual on Uniform Traffic Control Devices was a guideline, which did not require signalization at the intersection in question based on the research data presented in this case.
Finally, Jefferson Parish presented testimony from Joseph Blaschke, who was accepted as an expert in accident reconstruction and traffic engineering and roadway design. In preparation for trial, Blaschke reviewed the accident report, Matranga's deposition, Andrew Ramisch's deposition and investigated the Veterans-Homestead intersection before the geometric changes. He did not review photographs of the accident scene.
Blaschke's investigation of the intersection indicated that a driver at the stop sign on Homestead northbound had a sight distance about 1500 feet down Veterans. Further, the roadway at that point is straight and flat. Based on the available site distance and the estimated time necessary to cross the intersection, Blaschke reasoned that the motorcyclist was "clearly... in her sight distance" before Matranga entered the intersection and concluded that her failure to yield the right of way to *157 oncoming Veterans traffic was the sole cause of the accident.
He stated that the intersection at Veterans and Homestead was safe for a prudent driver. Further, he did not find that five "crossing" accidents was an unusually large number for a roadway with about 40,000 cars a day. Moreover, although the number of accidents could justify signalization for that intersection, it is "not unusual to find numerous intersections along [a] high volume road" that might meet the criteria to have a signal installed. However, if an intersection meets the criteria, the Manual does not require signalization. Once the criteria are met, installing a signal falls within the discretion of the traffic engineer. On cross-examination, Roberts reiterated that he did not find that the amount of traffic at Veterans and Homestead justified installation of traffic control devices other than stop signs.
After hearing the testimony, the trial judge held that Matranga's gross negligence was the sole cause of the accident. The standard of review for liability and apportionment of fault is the manifest error standard. Schexnayder v. LeBlanc Hyundai, 00-177 (La.App. 5 Cir. 9/18/00), 769 So.2d 683, 687, writ denied, 00-2860 (La.12/15/00), 777 So.2d 1227. Our review of the record indicates that the trial court made a reasonable determination regarding liability for this accident. Because the trial court's findings are not manifestly erroneous, we cannot disturb them on appeal. For the foregoing reasons, we affirm the trial court's judgment. Costs of this appeal are assessed equally to the parties.
AFFIRMED.
NOTES
[1] The trial court only considered damages asserted by Fuselier because Willard Gray, Trent's father, did not present evidence at trial of his loss of love and affection.
[2] In her brief, Fuselier presents seven issues for review, including whether Jefferson Parish breached its legal duty to maintain its highway in a reasonably safe condition, whether Jefferson Parish knowingly allowed a condition to exist that was hazardous to reasonably prudent drivers, whether the Parish failed to take reasonable measures to eliminate or reduce the risks associated with the dangerous condition, whether Jefferson Parish ignored "traffic warrants" that indicated that improvements should have been made to the intersection, whether Jefferson Parish's concern for the opinions of adjacent property owners caused the Parish to neglect its legal duty to eliminate or reduce unreasonably dangerous highway conditions. She also argues that the likelihood of harm was great in comparison to the minimal cost associated with correcting the risk of harm to reasonable motorists and that Matranga was not grossly negligent in failing to yield.
[3] La. Civ.Code Art. 2315 provides:

Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person.
[4] La. Civ.Code Art. 2317 provides:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody....
[5] At the time of plaintiffs' accident, La. R.S. 9:2800, entitled Limitation of liability for public bodies, provided:

A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
B. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under > Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
C. Constructive notice shall mean the existence of facts which infer actual knowledge.
D. A violation of the rules and regulations promulgated by a public entity is not negligence per se.
E. "Public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.