974 So.2d 703 (2007)
Kerry Jude LeBLANC and Annette St. Pierre LeBlanc
v.
STATE of Louisiana, through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT and Ronald Hayes.
Warren St. Pierre and Carole St. Pierre
v.
State Of Louisiana, through the Department of Transportation and Development and Ronald Hayes.
Nos. 07-CA-139 and 07-CA-162.
Court of Appeal of Louisiana, Fifth Circuit.
December 11, 2007.
*705 Stephen S. Stipelcovich, Michael J. Samanie, Attorneys at Law, Houma, Louisiana, For Plaintiff/Appellee.
Charles C. Foti, Jr., Attorney General, William S. Culver, Jr., Assistant Attorney General, Louisiana Department of Justice Litigation Division, New Orleans, Louisiana, For Defendant/Appellant.
Panel composed of Judges CLARENCE E. McMANUS, FREDERICKA HOMBERG WICKER, and GREG G. GUIDRY.
GREG G. GUIDRY, Judge.
In this automobile accident case, the Defendant, State of Louisiana, through the Department of Transportation and Development (DOTD), appeals a jury verdict in favor of the Plaintiffs, Kerry Jude LeBlanc and Annette St. Pierre LeBlanc, for damages sustained by Kerry LeBlanc. We affirm.
In the early morning hours of December 29, 2001, Kerry LeBlanc and his father-in-law, Warren St. Pierre, were traveling eastbound on a two-lane section of Louisiana Highway 3127 (La.3127) in St. Charles Parish. Around 5:30 a.m., a van driven by the Defendant, Ronald Hays, traveling in the opposite direction, crossed the median colliding head-on with the St. Pierre vehicle. All three men were injured. The accident occurred near the intersection with Louisiana Highway 3141 (La.3141), and approximately one mile from where La. 3127 changes from four to two-lanes. It was dark and foggy at the time of the impact.
LeBlanc suffered catastrophic injuries in the collision. His left leg was amputated below the knee, his right leg was badly broken, and his foot and right hand were crushed.
The Plaintiffs filed suit against Hays and the DOTD for negligence. A jury trial was held on October 9, 2006, resulting in a verdict in favor of the Plaintiffs.[1] The jury found Hayes 78% at fault and DOTD 22% at fault. It awarded the Plaintiffs a *706 total of $3,856,337.76, with costs assessed against the Defendants. The award consisted of $1,000,000 in general damages, $550,000 for loss of enjoyment of life, $379,960.76 for past medical expenses, $1,100,000 for future medical expenses, $155,377 for lost past wages, and $471,000 for future lost wages. The jury awarded Annette St. Pierre $200,000 in loss of consortium damages.
After the award was apportioned by percentage of fault, DOTD was assessed $200;000 for general damages, $121,000 for loss of enjoyment of life, $83,591.37 for past medical expenses, $242,000 for future medical expenses, $34,182.94 for lost past wages, $103,620 for future lost wages, and $44,000 for loss of consortium.
The DOTD appealed the judgment. The Plaintiff answered the appeal.[2]
The DOTD asserts the trial judge erred in denying its motion for directed verdict on liability because the Plaintiffs failed to prove that non-mandatory warning signs of the lanes' transition from four to two lanes were missing at the time of the accident, that any missing signs would have contributed to the accident, or that DOTD failed to replace the allegedly missing signs in a reasonable period of time. DOTD further asserts that the Plaintiffs failed to prove Hays would have seen or obeyed any warning signs in any event, considering the dense fog. DOTD also asserts that the jury's award for general damages, loss of enjoyment of life, future medical expenses, and loss of consortium was excessive.
The Plaintiffs assert that the trial judge erroneously allowed Defendant's employee to testify regarding inadmissible documents, and that the Defendant's percentage of fault should be increased.
LIABILITY
In actions against a public entity, the plaintiff must establish that the thing which caused the damage was in the custody of the defendant, that the thing was defective because it had a condition which created an unreasonable risk of harm, that defendant had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time, and that the defect was a cause in fact of plaintiffs injuries. La. R.S. 9:2800; Fuselier v. Matranga, 01-721, p. 5 (La.App. 5 Cir. 11/27/01), 803 So.2d 151, 154-155; writ den. 01-3393 (La.3/15/02), 811 So.2d 908; Warden v. Riehoux, 06-702 p. 7 (La.App. 5 Cir. 2/27/07), 952 So.2d 828, 831.
"Constructive notice shall mean the existence of facts which infer actual knowledge." La. R.S. 9:2800 D. constructive notice can be found if the conditions which caused the injury existed for such a period of time that those responsible, by the exercise of ordinary care and diligence, must have known of their existence in general and could have guarded the public from injury. Blount v. East Jefferson General Hosp., 04-407, p. 5 (La.App. 5 Cir. 10/12/04), 887 So.2d 535, 538; Warden, 06-702 at 7, 952 So.2d at 832.
The Defendant asserts Hays had sufficient warning of the lane change because there were reflector bumps and yellow striping on the highway, and furthermore, failed to prove the warning signs were missing. Alternatively, it argues that Plaintiffs failed to prove that the missing signs caused the accident, or that they "existed for such a period of time that those responsible, by the exercise of ordinary care and diligence, must have known of their existence in general and could have guarded the public from injury." *707 Blount, 04-407 at 5, 887 So.2d at 538; Warden, 952 So.2d at 832.
Hays was on his way to work the morning of the accident, traveling in the left lane on the four-lane portion of the highway. It was dark and foggy, and he was familiar with that portion of the highway. Hays traveled in the left lane focusing on the center line because of these conditions. He failed to notice when the lanes narrowed and unknowingly crossed the center line and began traveling on the wrong side of the highway.
Hays did not see cross-hatching at the lane merger. He did not notice reflector bumps along the road, or see any signs warning of the lane change. Hays testified that the fog was dense at the location of the accident, but, despite his focus on the highway's central stripe, he would have noticed at least one sign at the merger area had there been any. He did not remember seeing a ear behind or on the side of him, or notice the sign at the intersection he had just passed that instructed drivers not to pick up hitchhikers because of the nearby prison.
Ralph Borne was driving behind Hays prior to, and at the time of the accident. Borne testified that another car was traveling in the right lane alongside Hays for several miles, and was on Hays' right side when the accident occurred. However, the car did not stop.
Borne has driven along the roadway in question 14 days a month for 25 years to and from work. He was familiar with the lane merger. He testified there were no merger signs along the highway at the time of the accident. Borne also stated that, the fog was dense at the accident site, but less so at and leading up to the merger area. He was in position to see any merger warning signs had there been any. When Borne realized Hays was in the wrong lane, he tried to warn Hays by flashing his lights and honking his horn.
Warren St. Pierre's brothers, Glenn and George St. Pierre, were following Warren St. Pierre's vehicle on the morning of the accident. According to the three men, the fog was patchy prior to the accident, but heavy fog abruptly descended near the impact zone. Warren saw headlights coming toward him through dense fog. He unsuccessfully tried to avoid the collision.
The St. Pierre brothers were very familiar with that section of the highway. They testified that there were no warning signs or reflector bumps prior to the accident. Glenn St. Pierre further stated there were only speed limit signs and a hitchhiker warning sign. George St. Pierre added that, according to his measurements taken shortly after the collision, the distance from the merger to the point of impact was one mile.
The scene was in the same condition in January 2002 when Denise Gauthreaux, Plaintiffs sister-in-law, took photographs and video images on two different days.
Donna Reamey, a DOTD Highway Foreman II, testified that placement of most highway signs are not mandatory. This includes stop signs and merger warning signs. Although they may be recommended by the Manual on Uniform Traffic Control Devices (MUTCD), this publication is used in most states only as a guide. Individual states exercise discretion in placing signs according to particular needs.
Reamey is responsible for signage on state roads in seven parishes. She instructs her crews on where to place signs. Reamey spends 85% of her working, time traveling the roadways in these parishes evaluating the status of signs. Most of her inspections are done in the daytime, but she inspects the signs at night once a year *708 to evaluate their reflective ability. In addition to these inspections, all highway workers are expected to report damaged or missing signs. When Reamey receives a complaint or request for a sign, she prepares a work order. She also maintains a daily report of completed work. Near the time of this accident, periodic inspections were also made by driving along the roadways videotaping pertinent areas using a VIZA data inspection system.[3] In addition, Reamey maintains a notebook to record the location and type of signs needed along the roads. Reamey maintains these reports for five years.
According to Reamey's records, a work order was submitted in 1990 to install five merger warning signs at the particular accident site. However, nothing in her records indicated that warning signs were actually installed. Her records do show that in August of 2001 four hitchhiker warning signs were placed near the merger area because of the prison proximity. Those signs were in place on the morning of the accident
In July 2001 Reamey's crew was in the accident area replacing highway route markers. Reamey was unaware if the merger warning signs were in place at that time, but she had no record of receiving complaints concerning missing or damaged signs. A VIZA data inspection made along that section of the road during this time period failed to show any warning signs or sign posts without signs. A DOTD crew was the in the area again in November. No missing signs were reported.
When presented with Gauthreaux's photographs at the scene, Reamey acknowledged that it was odd that all five of the signs ordered in 1990 were missing. She did note that signs disappear routinely as a result of theft or collisions. She acknowledged that the posts were also missing. This was also highly unusual because she stated that the posts are driven three feet into the ground and are hard to remove.
In September 2002 the Defendant's investigators revisited the accident scene and took additional photographs. There were no warning signs present in those photographs. Reamey had no records of any type to establish that merger warning signs were installed between 1990 and September 2002.
The Plaintiffs' expert traffic engineer, Duaine Evans, testified that the MUTCD recommends the placement of warning signs near lane mergers to indicate that two-way traffic lies ahead. Although such signs are not mandatory, he believed that the safety of motorists mandated signs at this merger. He testified that these type of signs are especially important where weather conditions can be foggy or create poor visibility. In Evans opinion, Reamey's system was inadequate to insure that safety signs are installed where necessary. A reasonable time for replacing missing signs would be two to three weeks.
David Hall, the Defendant's expert in traffic engineering, testified that ground stripes are the primary control devices for any road. Stripes are visible in all weather, and can warn motorists even when signs are missing. However, he also said that striping is difficult to see in foggy conditions.
According to the majority of the evidence, the warning signs were missing in July 2001, on the date of the accident, December 29, 2001, and in March, July and September of 2002. The only evidence that the signs were in position at any time in 2001 was Reamey's testimony that she saw most of the signs in place *709 twelve days before the accident. However, her notes on this topic were sketchy at best and there were no documents showing that the signs ordered in 1990 were in fact ever installed, or that any signs were ordered anytime after that until the date of the accident. Furthermore, credible witnesses testified that no cross-hatched striping and/or reflector bumps were present when the accident occurred.
The appellate court reviews questions of fact under the manifest error standard. Linnear v. CenterPoint Energy Entex/Reliant Energy, 06-3030, p. 7 (La.9/5/07), 966 So.2d 36. Where there is conflicting testimony, inferences of fact should not be disturbed upon review, even though the reviewing court may feel that its own evaluations and inferences are as reasonable. Id. Breach of a duty and the cause in fact of the harm are factual questions to be determined by the factfinder. Linnear, 06-3030 at 7; 966 So.2d at 44.
The jury heard the testimony, evaluated the credibility of the witnesses and weighed all of the evidence. From our review, we find that the jury could reasonably have concluded that the warning signs were missing, that the lack of warning signs was a cause in fact of the accident, and that the Defendant had ample opportunity to discover and fix the problem. Thus, we find that the jury did not commit manifest error in finding the Defendant liable.
In the Plaintiffs' appeal, they contend that Reamey should not have been allowed to testify regarding inadmissible documents, and that the Defendant's percentage of fault should be increased. We find no abuse of discretion in the admission of the documents, or manifest error in the jury's assessment of fault.
DAMAGES
According to Dr. Richard Morvant, Kerry's orthopedic surgeon, Kerry's left lower leg and right hand were crushed in the accident, his right femur was fractured, and he sustained multiple fractures to his right foot. In addition to his several hand, foot and leg surgeries, he underwent several debridement procedures to his left lower leg to relieve the pressure that developed from the trauma in order to save the soft tissue. When debridement was unsuccessful, the lower part of the limb was amputated. Kerry then developed unending phantom pain. He also continues to experience pressure on the stump that requires adjustments to the prosthetic. Kerry's doctors continue to try to relieve the phantom pain, and, at one point, implanted a mechanical device in the spine. The procedure was unsuccessful.
Surgery was also performed to repair Kerry's leg fracture. A rod was inserted in the broken right femur. However, his right leg is now shorter than the left, and is rotated. In addition, the multiple fractures in his foot destroyed several bones in the heel and ankle which required bones grafts. Despite the surgeries, the foot is deformed, and the ankle is immobile. Additional surgery may be necessary, and he faces possible amputation if his foot continues to be painful and non-functional.
Kerry has significant disability to the right hand. The crushing injury to his thumb and hand broke several bones. Despite surgery, he cannot completely open and close his thumb or fingers, and his hand remains weak.
In addition, Kerry underwent hernia surgery that was directly related to the impact to his torso.
Dr. Morvant last treated Kerry in September of 2005, but saw him again right before trial. He testified that Kerry has *710 difficulty walking, he continues to suffer phantom pain, and the constant pressure on the leg stump will require revision and/or periodic replacement, refurbishing or readjustment. Dr. Morvant believes that Kerry is still in a fair amount of pain considering the number of severe injuries, and that he will require, long-term maintenance medication. Wound problems in his foot may develop because he is diabetic and has lost sensation there. Although his thigh and right hand are stable, he still has pain and loss of function, and his shoulder now hurts. Dr. Morvant attributed the shoulder pain to the injuries combined with inactivity from bed rest.
Doctor Morvant testified that Kerry sustained 70% disability to the hand, and 30% to the whole body from the hand injury. His left lower leg disability rating is 28%, and the right leg has 40-45% disability. The result is a total and permanent disability rating of over 100%.
Kerry LeBlanc testified that he was a crane operator at Avondale before the accident. He can no longer perform that job. He stated that he was knocked unconscious in the accident, and his legs were pinned under the dashboard. He subsequently regained consciousness and suffered severe pain for many hours until he was extricated from the wreckage.
Kerry demonstrated to the jury the residual hand restrictions and skin grafts for his thumb. His right foot still hurts and he still suffers severe phantom pain. He said he cries a lot, and unfortunately is becoming immune to the sleeping and pain medication.
Annette LeBlanc added that Kerry underwent hypobaric treatments in a pressure chamber to promote healing three times per week for four weeks. He currently sees a pain management specialist. Among his other medications, Kerry is taking Cymbalta, an anti-depressant. She noted that Kerry underwent thirteen surgeries within eight months, and the couple had to live with her sister for one month.
Annette stated she had just finished nursing school and was pregnant when the accident happened. She and Kerry looked forward to building a house, having more children and taking vacations. Now, they are financially unable to complete some of their plans, but have been able to build a house with wheelchair access.
Before the accident, Kerry liked fishing, yard work, and working out at a local gym three times per week. He currently fishes only occasionally, is limited to mowing the grass, and no longer works out at the gym. He tries to help at home by doing laundry and helping their young daughter prepare for school. Kerry agreed with his wife's assessment of his before and after capabilities. He added that he is limited in his ability to play with his daughter and their dog, and noted that his 18 year old son now has the burden of the yard work.[4]
The Plaintiffs introduced a report by Nathaniel Fentress, an expert in vocational rehabilitation, with credentials in formulating life care plans. Life care plans objectively analyze an individual's future care based on reasonable probability. They are subject to modification as needed.
Fentress obtained input from Independent Medical Examiner, Dr. Howard Katz, a Physiatrist, who informed Fentress that Kerry would require ongoing medical care indefmitely. Dr. Katz is a specialist in treating and determining the needs of seriously injured patients. Based on the information provided, Fentress consulted with the businesses and medical care facilities *711 to calculate the annual cost of the life care necessities, grouping them into ten categories.
For medical care, Fentress calculated Kerry's expenses to be $960 per year for six physiatrist or primary doctor care visits, and two orthopedic consultations per year. He projected annual prosthesis replacement and supplies at $6,107.00, including $5,607.00 per year for the leg prosthesis, and $500 per year for a special protective shoe for the right foot. The average annual expenses for diagnostic studies of the right ankle and foot were projected to be $195.00. Prescription medicine would cost $10,911.00 per year, and annual lab studies, $191.00. The fee for two physical therapy evaluations per year would be $164.00, and occupational expenses would be $82.00 for a total of $246.00.
Fentress believed that Kerry would benefit from a fitness program, which would cost approximately $468.00 annually, based on a fee schedule from a hospital gym. Fentress also listed nine items of durable medical equipment Kerry will need, including costs to replace and/or maintain the items. Kerry will need a straight cane, a wheelchair, a wheelchair cushion, two tub benches, one for home and one for traveling, a handheld shower, grab bars for the bathroom, a wheelchair backpack, and portable wheelchair ramps. The average annual expenses for durable medical equipment are $1,021.75.
Based on Dr. Katz's opinion, Fentress included assistance in daily living costs. Fentress calculated that Kerry will need one hour per day for an attendant until age 60. After that, he will require an increase to three hours per day. Over his life expectancy of 77.2 years, the total for attendant care is $271,414.00. In addition, Fentress added lawn care to this category. For 17 visits per year at $67.50 per visit, lawn care will cost $1,147.50.
The Fentress report includes architectural renovations to meet Kerry's needs. Anticipating that Kerry will need wheelchair access in his living environment by age 55, Fentress listed renovation costs at $35,000.00
Fentress concluded that the Life Care Plan offered is an objective reflection of Kerry's current medical care requirements. Based on the value of the dollar in 2003, and Kerry's life expectancy, he stated that Kerry faces an approximate cost of life care of $1,001,865.70.
In response, the Defendant's rehabilitation/life care expert, Ashley Briars, saw Kerry on one occasion and reviewed his records. Briars never spoke to Dr. Morvant, but reviewed his deposition and listened to his testimony. She recognized that Fentress had the input of Dr. Katz in preparing the plan, but noted Dr. Katz only saw the injured Plaintiff one time.
Briars concluded that Kerry's expenses are minimal. She disagreed with Fentress' calculations and conclusions stating they were either not supported by current medical testimony, or no longer are needed considering his physical improvement since the accident. She also noted that the Fentress report was made in 2003. Briars further stated Kerry had a great outlook as he was not seeing any doctor related to the accident. Briars said that Kerry did not appear depressed when she saw him and seemed content to stay home with his daughter, but she admitted he said he was depressed.
Reviewing the report by category, Briars stated that Fentress overestimated the costs related to the prosthesis. She claimed that a prosthesis is generally repaired, not replaced, and that $1,200.00 per year for silicone sleeve replacement is *712 reasonable. Sockets are replaced every other year at a maximum of $600. She stated supplies for that item would cost no more than $181.50.
Briars stated that Dr. Morvant did not testify that Kerry would require diagnostic, or lab studies. She also pointed out that some of the medications listed in the Fentress report have been discontinued. Kerry currently takes Lyrica, Oxycodone and antibiotics. Briars estimated the cost of Lyrica at $190 per month and Oxycodone at $82.00 per month. She did not price the antibiotics. The Court notes, however, that the cost of Lyrica and Oxycodone alone over Kerry's lifetime of approximately 30 years totals $8,160.00, which is a few thousand dollars less than Fentress' figures.
Briars also challenged the need for future attendant care assistance. She stated that no one recommended it, and he does not seem to need such care currently. She further found no need for including architectural renovations because the Plaintiffs built a new structure. In any event, she estimated construction of handicapped accommodations would only cost between $14,000 and $20,000, not $35,000.
Briars agreed Kerry would require pain management and medications for the rest of his life. However, she was unable to provide any monetary figure for his total life care to further refute the conclusions provided by Fentress.
In reviewing an award of general damages, the issue is whether the trier of fact abused its discretion. The discretion vested in the trier of fact is "great," so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). See also, Cone v. National Emergency Serv., Inc., 99-0934, p. 8-9 (La.10/29/99), 747 So.2d 1085, 1089; Kaiser v. Hardin, 06-2092, p. 9 (La.4/11/07), 953 So.2d 802, 809. The appellate court should increase or decrease the award only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances. Youn, 623 So.2d at 1261.
The jury awarded Kerry significant amounts for the various items of damages, but Kerry has suffered catastrophic lifelong injuries. He was in extreme pain immediately following the accident. He underwent numerous painful surgeries. His body is deformed and he is 100% disabled. He will require medical care for the rest of his life. Although Ashley Briars disagreed with the life care plan prepared by Fentress, she failed to provide an life care amount for the jury to consider. The jury weighed the evidence and the credibility of the witnesses and awarded Kerry an amount it found reasonable. In addition, the jury viewed the burdensome effect this life disability has and will have on Annette LeBlanc, and awarded her an amount it felt would compensate her for loss of consortium. Based on the evidence, we find that the awards are not excessive and that the jury did not abuse its discretion in the award of general damages, loss of enjoyment of life, future medical expenses and loss of consortium.
Accordingly, the judgment of the trial court is hereby affirmed. Costs of the appeal are to be paid by the Appellee.
AFFIRMED.
NOTES
[1] The St. Pierre suit was settled before trial.
[2] Hays did not appeal.
[3] The VIZA inspection program was later discontinued.
[4] Experts George Randolph Rice and Kenneth Boudreaux testified as to lost wages. We have not addressed that issue since it is not before us.